UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ETTA JALLOH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.07-1359 (RCL) |
| DISTRICT OF COLUMBIA, ) | |
| ) | |
| Defendant. ) | |

## NOTICE OF FILING ADMINISTRATIVE RECORD

Defendant hereby files the administrative record in the above captioned case.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Edward P. Taptich
EDWARD P. TAPTICH [012914]
Chief, Equity, Section 2

/s/ Maria L. Merkowitz
MARIA L. MERKOWITZ [312967]
Senior Litigation Counsel
441 4th Street, N.W.
Sixth Floor North
Washington, DC 20001
(202) 442-9842
FAX - (202) 727-3625
E-mail – maria.merkowitz@dc.gov

November 1, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ETTA JALLOH, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.07-1359 (RCL) |
| DISTRICT OF COLUMBIA, | ) | |
| Defendant. | ) | |

## INDEX OF RECORD

| | | |
|---|---|---|
| Certification of Record | - | 1 |
| HOD issued 4/30/07 | - | 2 |
| DB1- Disclosure letter dated 4/12/07 w/att. | - | 11 |
| DB2- Letter from Tyrka compelling DCPS witnesses, 4/12/07 | - | 13 |
| DB3- Due Process Complaint Notice, 2/15/07 | - | 14 |
| DB4- Hearing Notice, 4/2/07 | - | 17 |
| DB5- Student Evaluation Plan, 6/8/06 | - | 18 |
| DB6- Consent for Evaluation, 6/8/06 | - | 19 |
| DB7- IEP Meeting Notes, 7/25/06 | - | 20 |
| DB8- Functional Behavior Assessment, 10/10/06 | - | 22 |
| DB9- Request for Access to Student Records, 4/2/07 | - | 31 |
| DCPS Disclosure Statement w/att., 4/11/07 | - | 35 |
| DCPS-01 Due Process Complaint Notice, 2/15/07 | - | 37 |
| DCPS-02 Due Process Complaint Disposition, 3/7/07 | - | 39 |
| DCPS-03 IEP Meeting Notes, 6/8/06 | - | 43 |

DCPS-04 IEP with Meeting Notes, 7/25/06 — 44

DCPS Response to Parent's Administrative Due Process — 49
Complaint Notice, 4/11/07

Hearing Notice, 4/2/07 — 51

Scheduling Memorandum, 2/15/07 — 52

Due Process Complaint Notice, 2/15/07 — 55

Transcript of Hearing held 4/19/07 — 58

# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## Office of Compliance & Review
### *STUDENT HEARING OFFICE*
### SPECIAL EDUCATION

In the Matter RE:      B████, D████ vs. Rock Creek Academy

Case Information:      Hearing Dates: 04/19/2007
                       Held at: **District of Columbia Public Schools Headquarters**
                                **825 N. Capitol Street, N.E.**
                                **Washington, D.C. 20002**
                       Student Identification Number:  9071176
                       Student's Date of Birth: ████/1996
                       Attending School: **Rock Creek Academy**
                       Managing School: **Walker Jones Elementary School**
                       Hearing Request Date(s): 02/15/2007

## <u>CERTIFICATION OF RECORD</u>

   I, Shawnta Maddox, Legal Assistant of the Student Hearing Office,

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting of all letters, pleadings, orders,

exhibits and depositions.

   I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Tuesday, October 30, 2007.

**LEGAL ASSISTANT**
**STUDENT HEARING OFFICE**

1

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## *State Enforcement and Investigative Division*
## <u>CONFIDENTIAL</u>

### Charles R. Jones, Esq., Due Process Hearing Officer
### 825 North Capitol Street, N.E.  8th Floor
### Washington, D.C.  20002
### Facsimile:  (202) 442-5556

| | |
|---|---|
| **In the Matter of** ) | **IMPARTIAL DUE PROCESS** |
| ) | |
| D██████ B██████   Student, ) | **HEARING OFFICER'S DECISION** |
| Date of Birth: ██████-96 ) | |
| ) | |
| **Petitioner,** ) | Hearing Date: April 19, 2007 |
| ) | |
| **vs.** ) | |
| ) | Held at:  825 North Capitol Street, NE |
| **The District of Columbia Public Schools,** ) | Eighth Floor |
| **Attending: Rock Creek Academy** ) | Washington, D.C. 20002 |
| **Respondent.** ) | |

## <u>DECISION AND ORDER</u>

**Parent/Guardian:**       Ms. Etta Jalloh
                          1125 First Terrace, N.W.
                          Washington, D.C. 20001

**Counsel for Parent:**      Douglas Tyrka, Esq.
                            Tyrka & Associates, LLC
                            1726 Connecticut Ave., N.W.
                            Suite 400
                            Washington, D.C.  20009

**Counsel for School:**      Quinne Harris-Lindsey., Attorney- Advisor
                            Office of the General Counsel, DCPS
                            825 North Capitol Street, N.E., 9th Floor
                            Washington, D.C. 20002

2007 APR 30 PM 1:51
DC PUBLIC
SCHOOL SYSTEM

2

# HEARING OFFICER'S DECISION

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

### State Enforcement and Investigative Division
### Special Education Due Process Hearing

### I. INTRODUCTION

On February 15, 2007, a Request for Due Process Hearing was filed with the Student Hearing Office, by counsel for the parent, Douglas Tyrka, Esq. The request alleges DCPS failed to convene a MDT team meeting to review a Functional Behavioral Assessment ("FBA") of D.B. completed on or before October 10, 2006.

A Due Process Hearing was convened on April 19, 2007, at the District of Columbia Public Schools, ("DCPS"), 825 North Capitol Street, N.E., 8th Floor, Washington, D.C. 20002. Quinne Harris-Lindsey, Esq., Attorney-Advisor represented DCPS. Douglas Tyrka, Esq., represented the parent. Five Day Disclosure Letters were entered into the record, with no objection by either party. On behalf of the parent: Five Day Disclosure Letter dated April 12, 2007: Documents-1 through Documents- 9. On behalf of DCPS: Disclosure Letter dated April 11, 2007: DCPS-01 through DCPS-04 was introduced in the record. Parent's counsel waived a formal reading of the Due Process Rights. Witnesses on behalf of the parent: Sharon Millis. Witnesses on behalf of DCPS: DCPS did not call any witnesses to provide testimony in this case.

### II. JURISDICTION

The Due Process Hearing was convened, and this decision was written pursuant to *Public Law 108-446, The Individuals with Disabilities Education Improvement Act of 2004,* 20 United States Code 1400 et. Seq.; Title 34 of the Code of Federal Regulations, part 300; Title 5 of the District of Columbia Municipal Regulations and Section 145 of the D.C. Appropriations Act, effective October 21, 1998.

### III. ISSUES

**Whether DCPS denied the student FAPE by failing to convene a MDT team meeting to review a Functional Behavioral Assessment ("FBA") of D.B., which was completed on or before October 10, 2006?**

2.

3

## IV.    SUMMARY OF RELEVANT EVIDENCE

In this matter, petitioner by and through parent's counsel alleges that the District of Columbia Public Schools (hereinafter "DCPS") failed to provide T.G. a free and appropriate public education (FAPE).  It is alleged that DCPS failed to convene a MDT team to review a Functional Behavioral Assessment (hereinafter "FBA") for the student.  According to parent's counsel, it is alleged that on or about July 25, 2006 a multidisciplinary meeting ("MDT") was convened at Rock Creek Academy ("RCA"), the student's private educational placement.  At that meeting, educational officials determined that the student required a current FBA. Thereafter, Rock Creek Academy officials completed the FBA; however, it is alleged that DCPS never convened a MDT meeting to review the results of the assessment.  Parent's counsel requested a Motion for Summary Adjudication arguing that there does not exist any genuine issue in dispute; therefore, a motion for Summary Adjudication is warranted or, in the alternative, a Motion for Entry of Default and Default Judgment, as the motion stated that DCPS failed to provide a response to the complaint.[1]  The Hearing Officer deferred his decision on these motions.  DCPS asserts that the student has been provided a free and appropriate public education, as the student's IEP is current and it is being implemented within a private educational setting capable of providing educational benefit.  Respondent's counsel also alleges that the procedural omission of failing to convene a meeting to review the FBA should not be determine a denial of FAPE without a clear showing of educational injury.  After the parties provided opening arguments, the Hearing Officer determined that the only outstanding issue is whether petitioner has been educational damaged by the failure of the FBA to be reviewed; consequently, evidence concerning that issue was requested.

## V.    FINDINGS OF FACT

The Hearing Officer makes the following findings of fact:

1.      D. B. is a ten- (10) year old District of Columbia resident and a student presently enrolled at the Rock Creek Academy during the 2006-2007 school years. RCA is private educational placement funded by DCPS.

2.      D.B. is eligible for special education and related services.  According to the student's most recent Individualized Educational Program ("IEP") dated July 25, 2006, the student is multiply disabled including: Emotional Disturbance (ED), Specific Learning Disability (SLD) and Other Health Impaired (OHI).[2]

3.

---

[1] DCPS did file a response to the complaint albeit late.
[2] Exhibit: DB-04.

4

3.      According to the student's IEP, D.B. requires a full-time special education program, as the percent of time D.B. is not in a regular education setting is 100%.

4.      Sharon Millis, Educational Advocate/ Expert for the student, testified and concluded that she had been the student's educational advocate for approximately two-(2) years.

5.      Ms. Millis testified that she had not observed D.B at his present non- public educational placement at RCA.  Students attending private placements are generally not observed unless specifically requested.  Ms. Millis concluded she had not been requested to observe the student at RCA.[3]

6.      According to Ms. Millis, the student was suffering from a severe case of emotional disturbance and the FBA should provide further structure to allow him to obtain educational benefit.  Additionally, Ms. Millis explained that a FBA could be used to change the program of a student.

7.      On cross-examination, Ms. Millis indicated that RCA did have a therapeutic component and a Behavioral Intervention Plan, which would have an impact on the student's emotional conduct.  All students at RCA have access to a Behavioral Intervention Plan (BIP).

8.      Ms. Millis further testified that she had not performed a formal observation, but she had informally observed the student, as she often visited RCA due to presents of a number of other clients at the school.

9.      Based upon the informal observation, the student was having some of the same concerns including: lack of focus and self- esteem issues.

4.

---

[3] Testimony of Sharon Millis at the Due Process hearing.

10.    The student's IEP dated July 25, 2006 indicates that the student was making progress academically and behaviorally, as his interaction with his peers is positive and he can be easily redirected if he is displaying silly behavior.[4]

## VI.    DISCUSSION AND CONCLUSION OF LAW

In this case, petitioner by and through parent's counsel has failed to sustain its burden of proof.  The sole and fundamental issue in this matter is whether DCPS has denied this student FAPE by failing to convene a MDT team meeting to review a FBA. A preponderance of the evidence does not support the parent's contention that the failure to convene a MDT meeting to review a FBA resulted in this student suffering educational harm, which amounted to a denial of FAPE.  It is noted, at the outset, that the student is attending a private educational placement, which has been selected by the parent for its capability of implementing the student's IEP and providing educational benefit.  As this is the cornerstone of a private educational placement, the petitioner must provide direct and proximate evidence of an educational injury.  Here, in this instance, the educational advocate clearly testified that she had never observed the student in his classroom setting at RCA, as private placements are generally not formally observed.  As there is no evidence of educational injury, DCPS through its agent RCA has provided the student a free and appropriate public education.

IDEA mandates and requires that a local educational agency (LEA) provide an eligible student with an appropriate educational placement capable of implementing a student's IEP and providing some educational benefit.  Here, in this instance, there is an assertion that the student has been denied FAPE, as the student's FBA was not reviewed and included in the student's IEP.  While this is a procedural omission, the petitioner must equate this omission to some educational harm, which must amount to a denial of FAPE.  In this matter, the student was attending a private placement; there is evidence of educational benefit and there is an existing BIP, which was being implemented. Moreover, the petitioner did provide evidence of educational harm.  Under this set of circumstances, DCPS has provided this student with a free and appropriate public education.

**Based upon the foregoing, IT IS HEREBY ORDERED:**

1)  **Petitioner's request for relief is DENIED.**

5.

---

[4] Exhibit: DCPS-04.

2) Petitioner request to find a denial of FAPE for DCPS' failure to convene a MDT meeting to review a FBA is DENIED.

3) Petitioner's petition is DISMISSED.

VII.    APPEAL PROCESS

        This is the FINAL ADMINISTRATIVE DECISION.  Appeals may be made to a court of competent jurisdiction within ninety- (90) days from the date this decision was issued.

Date Filed: 04-30-07

Charles R. Jones, Esq., Hearing Officer

Date Issued: 4|30|07

6.

7

# District of Columbia Public Schools
## *State Enforcement Investigative Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
FAX: (202) 442-5556



### *FACSIMILE SHEET*

Date:  April 30, 2007

TO:  Douglas Tyrka

FROM:  STUDENT HEARING OFFICE

RE:  B▮▮▮, D▮▮▮▮

TOTAL NUMBER OF PAGES, INCLUDING COVER: 7


COMMENTS:

*CONFIDENTIALITY NTOICE*:  The information accompanying this facsimile is intended only for the use of the individual or entity named above.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the content of this telecopied information is strictly prohibited.

| TRANSMISSION VERIFICATION REPORT | |
|---|---|

```
                                    TIME  : 04/30/2007 14:33
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : BROE6J471573
```

```
DATE,TIME          04/30  14:32
FAX NO./NAME       92022554264
DURATION           00:01:47
PAGE(S)            07
RESULT             OK
MODE               STANDARD
                   ECM
```

# District of Columbia Public Schools
## *State Enforcement Investigative Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
FAX: (202) 442-5556



### *FACSIMILE SHEET*

Date: April 30, 2007

TO: Douglas Tyrka

FROM: STUDENT HEARING OFFICE

RE: B█████, D█████

TOTAL NUMBER OF PAGES, INCLUDING COVER: 7

COMMENTS:

9

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**Recipient:**    OGC

**Fax Number:**

**From:**    Douglas Tyrka

**Regarding:**    D▬▬ B▬▬

**# of pages:**    25

**Notes:**    DISCLOSURE



## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Associates or their client(s) that is intended solely for the recipient named above. If you are not the intended recipient named above or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Associates expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Associates. Thank you.

# TYRKA &
## ASSOCIATES, LLC

1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**April 12, 2007**

Attorney-Advisor
Office of the General Counsel
District of Columbia Public Schools
Washington, DC 20002-4232
By Fax: 202-442-5097/5098

RE:    D█████ B█████ (D.O.B. ███96)

Attorney-Advisor:

A hearing has been scheduled for **9:00 a.m. on April 19, 2007**, to adjudicate a due process complaint filed on behalf of the above-captioned student, D█████ B█████. In addition to any documents and witnesses disclosed by DCPS, the parent reserves the right to rely on the following witnesses and documents, as well as any other documents previously disclosed or offered into evidence in any other matter concerning this student.

Documents:

1. 04/12/07   Disclosure Letter
2. 04/12/07   Notice Compelling DCPS Witness(es)

**Administrative Record**

3. 02/15/07   Due Process Complaint Notice
4. 04/02/07   Hearing Notice

**IEPs, MDT Notes, Etc.**

5. 06/08/06   SEP
6. 06/08/06   Consent for Evaluation
7. 07/25/06   MDT Meeting Notes

**Evaluations**

8. 10/10/06   Functional Behavior Assessment

**Correspondence**

9. 04/02/07   Request for Access to Student Records

**DB1**

Witnesses:[1]

1. Ms. Etta Jalloh, Guardian; 1125 First Terrace NW, Washington, DC 20001; 202-371-9412, 202-391-1414
2. Ms. Sharon Millis, Special Education Advocate & Expert; Tyrka & Associates, LLC
3. Mr. Keith Coyle, Associate; Tyrka & Associates, LLC
4. Mr. Zachary Nahass, Associate; Tyrka & Associates, LLC
5. Ms. Camille McKenzie, Office Assistant; Tyrka & Associates, LLC
6. Mr. Michael Tchorni, Law Clerk; Tyrka & Associates, LLC

Respectfully submitted,

Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave NW, Suite 400
Washington, DC 20009
(ph) (202) 265-4260
(f) (202) 265-4264

---

[1] Some witnesses may be testifying by telephone and/or use a designee. The address and phone numbers for all employees or agents of Tyrka & Associates can be found in the letterhead for this correspondence.

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

April 12, 2007

Attorney-Advisor
Office of the General Counsel
District of Columbia Public Schools
Washington, DC 20002-4232

RE:    D█████ B█████ (D.O.B. ██/██/96)

Attorney-Advisor:

Pursuant to 34 C.F.R. § 300.509(a)(2) and D.C. Mun. Regs. tit. 5 § 3031.1(b), Petitioner hereby compels the following necessary and material witnesses:

1.  Any DCPS employee and/or agent who has drafted notes of any meeting or telephone conversation, which DCPS intends to submit as evidence at this hearing.

Respectfully submitted,

Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave NW, Suite 400
Washington, DC 20009
(ph) (202) 265-4260
(f) (202) 265-4264

3

**DB2**

# DUE PROCESS COMPLAINT NOTICE
### In re D█████ B█████
## February 15, 2007

**Petitioner:**        Etta Jalloh
**Student:**           D█████ B█████
**DOB:**               █████/96
**Current School:**    Rock Creek Academy ("RCA")
**Residence:**         1125 First Terrace, N.W.
                       Washington, DC 20001

**Petitioner's Contact Information for Special Education Purposes:**
                       Tyrka & Associates, LLC
                       1726 Connecticut Ave. N.W. Suite 400
                       Washington, D.C.  20009
                       Tel:  202-265-4260
                       Fax:  202-265-4264

**Violations:**

1. Failure to review current evaluations in all areas of suspected disability.

**Facts:**

1. At a July 25, 2006 meeting:
   a) the multidisciplinary team ("MDT") determined that a current functional behavioral
      assessment ("FBA") of D█████ was warranted;
   b) DCPS delegated its responsibility for completing this assessment to RCA;
   c) the Petitioner signed a written consent form authorizing the completion of this
      assessment.
2. On October 10, 2006, RCA completed an FBA of D█████
3. DCPS has not convened an MDT meeting to review the results of D█████ FBA since
   October 10, 2006.

**Proposed resolution:**

1. DCPS to immediately convene an MDT meeting to:
   a) review the results of D█████ FBA;
   b) develop an appropriate compensatory education plan to compensate D█████ for its failure
      to review the results of D█████ FBA since October 10, 2006.
2. DCPS to pay reasonable attorney fees and costs incurred in bringing and pursuing this case.

**Resolution Meeting:**

1. The Petitioner contends that a representative of the LEA with authority to:
   a. immediately convene an MDT meeting and

**DB3**

14

b. negotiate attorneys' fees for work performed prior to the resolution meeting is a necessary attendee at any resolution meeting.

2. If this individual is not going to be in attendance, Petitioner requests that DCPS provide counsel with a written notice waiving its right to a resolution session 48 hours prior to any scheduled meeting.

3. The Petitioner contends that any meeting not attended by the identified individual is not a valid resolution session, but rather an informal settlement discussion.

4. The Petitioner will be accompanied by his or her attorney at any resolution session convened subsequent to the filing of this complaint and will record any resolution session by analog or digital means.

5. Any statements by the Petitioner or his or her representative during any resolution meeting or other settlement discussion incident to the filing of this complaint are for the purposes of compromise only.

Respectfully submitted,

Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave NW, Suite 400
Washington, DC 20009
(ph) (202) 265-4260
(f) (202) 265-4264

15

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 02/15/2007 15:21
                                    NAME  : TYRKA & ASSOCIATES
                                    FAX   : 2022654264
                                    TEL   : 2022654260
                                    SER.# : 000A6J693992
```

```
DATE,TIME            02/15  15:20
FAX NO./NAME         SHO
DURATION             00:00:46
PAGE(S)              03
RESULT               OK
MODE                 STANDARD
                     ECM
```

# TYRKA & ASSOCIATES, LLC

1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

*Recipient:*    SHO

*Fax Number:*

*From:*    Douglas Tyrka

*Regarding:*    D███ B███ (D.O.B. ███/96)

*# of pages:*    3

*Notes:*    Due Process Complaint

# District of Columbia Public Schools
## State Enforcement & Investigation Division
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



### HEARING NOTICE

MEMORANDUM VIA: [✓] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:    Parent (or Representative): D. TYRKA          Fax No.: 265-4264

LEA Legal Counsel: OGC

RE:    B_____, D_____          and (LEA) DOB: ___/96
       Student's Name

FROM:  SHARON NEWSOME
       Special Education Student Hearing Office Coordinator

DATE SENT: 4/2/07

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on 3/13/07. Please be advised that the hearing has been scheduled for:

DATE:    4/19/07

TIME:    9:00 AM

AT:    825 North Capitol Street, NE, Washington, DC
       8th Floor

ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made *exclusively* by the Hearing Officer, and cannot be made by SHO administrative staff. Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[✓] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special Education Student Hearing Office.

**DB4**

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
STUDENT EVALUATION PLAN
(SEP)

MDT SEP

MDT REFERRAL DATE: __6/8/2006__                                    MEETING DATE: __6/8/2006__

STUDENT: _Barry Donald_  DOB: __/1995_  AGE: __10__  GRADE: __4__  SCHOOL: _Rock Creek Academy_
STUDENT IDENTIFICATION NUMBER: __9071178__  TEACHER/HOMEROOM: Ms. McKenzie / Ms. Kepple
ADDRESS: _1125 First Terrace N.W., Washington, D.C. 20001_
PARENT(S)/GUARDIAN: _Etta Jalloh_  TELEPHONE (H): ___  TELEPHONE (W): ___

**Summarize Area(s) of Concern:**
MDT wants to make sure that Donald has the correct disability classification, and he to ensure he's receiving the appropriate services.

**Team Recommendations:**
MDT would like to recommend that Donald has a Functional Behavior Assessment.

|  |  |  | TIMELINE | |
| --- | --- | --- | --- | --- |
| **ASSESSMENT** | **ASSESSOR** | **TEST INSTRUMENT** | **ASSIGNED** | **DUE DATE** |
| Other | ___ | Functional Behavior Assessment | ─ | ─ |

| TEAM MEMBERS: NAME | POSITION | TEAM MEMBERS: NAME | POSITION |
| --- | --- | --- | --- |
| _Ms. Page_ | _IEP Coordinator_ | _Cheri Waul_ | _DCPS-LEA Monitor_ |
| _Ms. McKenzie_ | _Special Educator_ | _Ms. Kepple_ | _Special Educator_ |
| _Sharon Mills_ | _Educational Advocate_ | ___ | ___ |

The MDT meeting to discuss the evaluation results is scheduled on ___ at ___ in room ___

**DB5**

MDT

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
WASHINGTON, D.C.

**CONSENT FOR EVALUATION - INITIAL OR REEVALUATION**
(*CHECK ONE ONLY - INITIAL OR REEVALUATION)

**I. INITIAL EVALUATION CONSENT**

As a result of the review of the screening information at the MDT meeting on ___6/8/2006___
It was determined in a MDT meeting that your child, ___Beacon, Donald___
is in need of a full and individual evaluation to assist us in developing the most appropriate educational program.
You have been provided a copy of that "Procedureal Safeguards - Parental Rights" booklet. We would like to remind you at this time that:

- granting consent for this evaluation is a voluntary action on your part
- this consent may be revoked at any time although the school district is required to tak all necessary action to provide an appropriate program and may be required to initiate due process procedures to obtain content and;
- by granting consent in writing, you are agree to the evaluation(s) in Section 111.

**II. REEVALUATION** ☑

The MDT received the following request for a reevaluation for ___Beacon, Donald___
by / for a: ☑ parent request    ☐ teacher request    ☐ 3 year reevaluation
The MDT will collect supportive documentation in the area of the disability to determine teh need for continued special education and related services. The school is required to only evaluate in those areas of documented need or consensus of the MDT (parent is a member of team). Parents have the right to requirest assessments to dtermine if the child continues to be a child with a disability. DCPS may reevaluate your child, without your consent, if the school district can demonstrate that it has taken reasonable steps to get parental consent and the parent has not responded.

- granting consent for this evaluation is a voluntary action on your part;
- this consent may be revoked at any time although the school district is required to take all necessary action to provide a Free Appropriate Public Education program and may be required to initiate due process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the evaluation(s) on the student evaluation plan (SEP).

**III.** I give permission for Distrio of Columbia Public Schools to proceed with the evaluation(s) based on the Student Evaluation Plan (attached) for my child, ___Beacon, Donald___

Within a reasonable period of time days after copmletion of the evaluation, we will hold another MDT meeting (to which you will be invited) to determine if your child is eligible for special education and related services. The written reports of all procedures administered will be provided to you at that meeting, along with explanations and interpretations. We will use this information to determine an appropriate program for your child. If records are to be obtained/relatesed as part of this evaluation, the "Consent for Release of Records" form is completed and attached.
If you have questions or concerns at any time during the evaluation process, feel free to contact me at ___202-378-1388___ (telephone number)

☐ INITIAL  ☑ REEVALUATION
Parent Response Section:

I agree to the proposed evaluation(s)        I do NOT agree to the proposed evaluation(s)

_____          _____
Parent/Guardian Signature                   Date

**DB6**

https://www.e-ieppro2.com/rca/Evaluation/PrintEvalSelections.asp?ID=298        7/25/200

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### WASHINGTON, D.C.

### INDIVIDUALIZED EDUCATION PROGRAM
### (IEP)
### MEETING NOTES

STUDENT: __B____, D____ __    SCHOOL: __Rock Creek Academy__    DATE: __7/25/2006__

| PARTICIPANTS | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Etta Jalloh | | Mother |
| Sharon Millis | | Educational Advocate |
| Ms. Page | | IEP Coordinator |
| Mrs. Waul | | DCPS-LEA Monitor |
| Ms. Kepple | | Special Education Teacher |

The purpose of today's meeting is to update his IEP and discuss his overall academic and behavioral progress. DCPS and advocate is in attendance, and parent will participate by phone. The team will also discuss compensatory education plan.

Ms. Kepple, Special Educator. Is D_____ language art and reading teacher. In reading and writing he is functioning on the third grade level. His comprehension is good if he is focused. He can be very fidgety and impulsive. He is currently on level 2 for his behavior. Ms. Kepple created goals for him in the area of reading and written language. He needs to increase his spelling skills with long vowel patterns and use contractions correctly. In addition, he doesn't always put capitalization and punctuation not because he doesn't know, but because he's not paying close attention. D_____ has a couple of close friends. Generally he is quieter with the other students, but for the most part his interactions with his peers is positive. When displaying silly behavior he can be easily redirected. D_____ responds well to praise and rewards.

Based on clinical evaluation that was completed December 8, 2005; it was recommended by evaluator that D_____ should receive .5 per/wk, 3x's which equates 1.5 hours per/wk of counseling services. Counseling was not added to IEP dated 4/27/2005, and testing was not done which prevented him from getting the services that he needs. DCPS is offering 125 specialized instruction and 40 for clinical therapy to be divided individually and group. 20 hours for individual and 20 hours group therapy. DCPS is asking for 30 days to implement the tutorial and counseling piece and if it is not implemented then the parent and advocate is asking for an independent tutor within the superintendents cost guidelines.

MDT determined that all of D_____ evaluations are current. He is a student that requires special education services he will receive 26.0 hours per/wk of specialized instruction and 1.5 hours per/wk of clinical therapy. His placement will continue to be Rock Creek, and his accomodations is small group, repeated directions, extended time. MDT agreed to devise SEP for a Functional Behavior Assessment.

**DB7**

D█████ B█████    MDT   7/25/06

DCB agrees to 125 hours of tutoring and 20 hours of group and 20 hours of individual counseling as comped. DCS has 30 days to provide this. Before a provider of Parents choice is obtained

PRABIT is recommended and agreed on by team

Clinician and OT will review the goals and construct goals/objective of comp ed will be provided for 38 hours by an independent provider

21



Rock Creek Academy, Inc.
4401 Connecticut Ave. NW
Washington, DC 20008
202.378-1400: voice

## FUNCTIONAL BEHAVIOR ASSESSMENT

NAME: Dennis Brown,            SCHOOL: Rock Creek Academy

DOB:    1996                   GRADE: 5

AGE:    10 years, 2 months     EXAMINER: Anthony Smith, CADC II

DOR:    10/10/2006

**EVALUATION METHODS:**

IEP and Records Review
Interviews
Student Classroom Observations

**REASON FOR REFERRAL:**

Dennis Brown, is a 10 year, two (2) month old, African-American male, who was referred by his academic placement for a functional behavior assessment. The assessment will investigate the behaviors that interfere with his academic and social interactions with both peers and adults; and directly impact his academic achievement. It will then offer recommendations for managing this problematic behavioral pattern in the school setting.

**RELEVANT BACKGROUND INFORMATION:**

Student's 7/25/06 and 4/27/05 *IEP Meeting Information/Notes*; 3/09/06 *DCPS Hearing Officer's Decision & Order*; 12/18/05 *Clinical Evaluation Report*; and December 2005 *Addendum Psychiatric Evaluation Report* were thoroughly reviewed in preparation of this report. Also, student's former special education teacher, current primary special education teacher, Language Arts Teacher, clinical therapist, occupational therapist and teacher assistant for social studies, science and math were interviewed. Efforts were also made to communicate with Ms. Etta Jalloh (student's grandmother).

DB8

- 2 -

B██████, D█████—FBA (October 2006)

D█████'s Clinical and Psychiatric Evaluations were undertaken by Mental Health Resources Plus, LLC and reference previous evaluative studies of this student. Melanie Lewis, PhD (Psychology Associate) with Joan E. Gildemeister, PhD (Licensed Clinical psychologist) completed the evaluation. This endeavor was part of a reevaluation process to determine student's appropriate educational placement and to determine need for special educations services.

Reportedly, the clinical interview involved a friendly and fully engaged student, who was relatively polite and greeted his evaluators with a smile. This was reflected in his demeanor as, according to his evaluators his overall affective presentation was politeness and cooperativeness. The Children's Depression Inventory; Conner's Teacher Rating Scale _Revised (S); Conner's Attention Disorders Scale – Teacher Edition; Pier-Harris Children's Self Concept Scale 2; Kinetic Drawing System; and Roberts Apperception Test for Children wee administered during the course of this evaluation. Conclusively, while D█████ presented as an elementary-grade student with a long standing history of inattentiveness and hyperactivity in addition to some oppositional behaviors, his interactions with peers and adults can sometimes result in aggression. Student was deemed to be experiencing insignificant clinical levels of depressive symptoms. He appeared to meet the criteria for the DSM IV diagnosis of Attention Deficit/Hyperactivity Disorder, Combined Type. Full DSM IV Diagnostic Impressions for D█████ were as follows:

Axis I:  314.01 Attention-Deficit/Hyperactivity Disorder, Combined Type
         312.9 Disruptive Behavior Disorder Not Otherwise Specified

Axis II:  Low Average Intellectual Functioning (by report)
Axis III: None Reported
Axis IV: Psychosocial Stressors: Death of Family Member (brother); Disruption of family by
                                 Separation; Physical abuse (Alleged); Academic Difficulties;
                                 Discord with teachers and classmates
Axis V: Current GAF: 50 (Current)

Doctors Lewis and Gildemeister summarized that D█████ met the criteria for services as an Emotionally Disturbed student and recommended: 1) placement in a therapeutic special education setting with a high level of structure, small student-teacher class ratio, comprehensive behavioral management structure and mental health services; 2) psychiatric consultation to determine appropriateness and effectiveness of psychopharmacology relating to his ADHD; 3) psychotherapy; 4 group psychotherapy; 5) family therapy; and 6) design/implementation of a Behavioral Intervention Plan to address his inattentiveness and hyperactivity.

Utkarsh Joshi, M.D. (Child Psychiatrist) of MRI+ completed the Addendum Psychiatric Evaluation (November and December 2005). An earlier August 2005 Psychiatric Evaluation that was coordinated by DC Public Schools was deemed "incomplete" due to a lack of insufficient information, lack of access to school records and not being conducted at the student's school setting (Walker Jones Elementary). Dr. Utkarsh incorporated in his evaluation Psychoeducational Report (September 2004); Speech & Language Evaluation (July 2004); Social Work Evaluation (Spring 2004); Occupational Therapy Initial Evaluative Report (December 2004); Psychoeducational Evaluative Report (December 2004) and Clinical Evaluation Report information of December 2005.

– 3 –

B████, D████ --FBA (October 2006)

Inclusion of the above evaluative data:

- Presented a teacher's perspective and a more accurate depiction of D████ demeanor and behavior in the classroom and at school and clarified to what extent D████ manifest problem behavior in the school setting.
- Student's September 2004 Psychoeducational report summed that D████ "appears to be achieving most notably below grade capacity in reading and writing while demonstrating near grade level skills in arithmetic..."
- Psychoeducational evaluative report of December 2004, "found him to be a friendly and active youngster, who functions cognitively in the average range with relative strength in nonverbal reasoning and relative weakness in verbal reasoning. He could benefit from school counseling to address issues related to his behavior in school and school rules, completing work, and self-esteem. He demonstrated a small discrepancy between his cognitive ability and academic achievement level and thus may be eligible for special evaluated services as a child with learning disabilities..."
- Speech and Language Evaluation (July 2004) revealed borderline average, expressive language skills, and slightly below average receptive language skills with a primary weakness in establishing relationship between words and vocabulary knowledge. The report recommended that interventions may be warranted.
- An Occupational Therapy evaluation (December 2004) outruled the benefits of OT at that time due to his average ability in testing areas.
- A Social Work Evaluation (Spring 2004) encompassed family dynamics that exists in D████ continuing and distant relationship with his father; parental concerns as shared to the social worker by his mother, developmental concerns for child and disciplinary measures that have been incorporated in the family home; educational enrichment outside of the school and home settings; and parental monitoring and management since parent's residential move outside the family home.

In summation, Dr. Utkarsh echoes similar recommendations as presented in D████ (December 2005) Clinical Evaluative Report.

Review of student's 4/25/05 IEP Meeting Notes denotes full review of all student assessments and a determination by the IEP team that D████ was eligible for Social Education and Related Services. Also at this meeting the team: 1) agreed to a Psychiatric evaluation to rule out ADHD and to determine eligibility for LD and receive specialized services for Reading Comprehension; and 2) Comp Education hours were discussed for student needs that to date had gone unaddressed. Student Guardian (Etta Jalloh- grandparent) and the IEP team are at odds whether D████ needs can be properly addressed at Walker Jones Elementary (home school) and whether a FBA is warranted due to outstanding concerns regarding student's behavior.

In a formal "petition" on behalf of D████, a formal hearing occurred (March 6, 2006) to determine whether DCPS denied student FAPE by failing to provide an appropriate educational placement and by failing to comply with a Hearing Officer's Determination ("HOD") issued February 22, 2006. Charles R. Jones, Esquire, Hearing Officer ruled in favor of the petitioner noting that DCPS had failed to complete D████ IEP. Moreover, DCPS failed to implement recommendations that were presented in student's December 2005 Clinical Evaluative Report. Student was to be placed immediately at the Rock Creek Academy for the remainder of the 2005-2006 school year. DCPS and Rock Creek Academy were to convene a MDT/IEP at Rock Creek to review all current evaluations including OT Evaluation and the Psychiatric Evaluation, develop

– 4 –

B████, D████ –FBA (October 2006)

an appropriate IEP as warranted and discuss and determine if compensatory education is warranted within thirty (30) calendar days of the issuance of the HOD.

At student's MDT/IEP Meeting of July 25, 2006, the IEP team agreed to afford D████ 27.5 hours per week Special Education and Related Services - 25.25 hours/week were created for Special Instruction; 1.5 hours/week were applied for Clinical Therapy and 0.75 hours/week were implemented for Occupational Therapy. Additionally, a Functional Behavioral Assessment and Behavioral Intervention Plan were recommended and agreed to by the team.

## OBSERVATIONS OF BEHAVIOR:

D████ has been a student at Rock Creek Academy since the spring semester of the 2005/06 school year. He is enrolled in the fifth grade. His primary Special Educational classroom teacher is Ms. Selma Woldemichael. This writer's first observation of D████ occurred on the afternoon of October 5, 2006 while he and other classmates practiced drum lessons on the Lower Level of the school's music room. Students were seated in a semi-circle on the left side of the music room where Ms. Bradley shouted out rhythmic paces. Each student was paying attention to Ms. Tina Bradley (Instructor) who drilled them in not only reading the music but also remembering on which note the drum beat was being emphasized. D████ class attempts to master Patakata, Botswanatamba Alioop & Africa drum beats, which will be presented later this semester during the Thanksgiving Harvest Student Assembly. D████ B████ appeared happy and excited about playing the drum. He appeared to be so enthusiastic that he sometimes got mixed up as to which hand he should use to beat the drum. He was quick to verbally convey on which note the drum beat placed emphasis. During the 35 minute observation witnessed by this writer, Ms. Bradley verbally prompted student once to allow a classmate to speak. Otherwise student's overall behavior was appropriate.

D████ was observed once again (45 minutes) on October 6, 2006, as he transitioned from Occupational Therapy into Ms. Annunziata's classroom for math, science and social studies. The classroom is a 4th floor, fairly long, and almost triangular-shape, windowed learning environment that is approximately 30 feet long and measuring from 12' to 15' wide along its length. Windows are found along the entire left wall and wrap around to the front of the classroom. It is a very colorful room with numerous posters and artistic displays dispersed throughout. Ms. Annunziata's posters serve as cues to help students recall important elements in math, science and reading. Additionally, classroom posters reinforce student responsibility in complying with Fire Drill and expected classroom rule of conduct.

The teacher's desk is at the front of the classroom, where the left wall curves into the front classroom wall. The classroom board is fixed on a curving right wall of the classroom and within close proximity of the teacher's desk. Six (6) individualized student desks are located in front of the teacher's desk with three (3) desks on the left side of the classroom (near windows) and three on the right side of the classroom.

Multiplication problems were written on the classroom board, as D████ and other classmates transitioned from a therapeutic setting into Ms. Annunziata's classroom. Ms. Deidre Green (Teacher Assistant) covered the class for Ms. Annunziata, who was not at school on this occasion. The following observations of the aforementioned student were made from 10:15 AM – 11:00 AM on October 6, 2006:

- D████ made smooth transition from OT into classroom. Student went immediately to the first desk that is on the right wall and closest to teacher's desk.

- 5 -

Be____, D____ —FBA (October 2006)

- D____ began a written multiplication exercise but was rather fidgety in initial attempts to complete it. Verbal requests by student (aloud) for help by his teacher were followed by student compliance to attempt the assignment independently. D____ began to think out loud and use his fingers to compute. In haste, he left his desk, approached the instructor to note he had the right answer. Ms. Green (Teacher Assistant) identified errors in student's work and reminded him of essential arithmetic cues he should follow to compute the problem correctly. D____ appeared more focus and returned to his desk. Approximately four minutes later, D____ returned to the teacher's desk pulling up his chair to imply that he had finished all of his math problems. Quick review by Ms. Green revealed that D____ continued to make similar mistakes in computation. She had him recite/recall multiplication tables and multiplication rules in carrying a number (from the unit column to the tens column) and allowed student to sit next to her in recomputing his math problems. Thereafter for the next 20 minutes, student was able to sit quietly and focus on his math assignment independently and without distraction.
- While Ms. Green left the classroom for a brief period (five minutes) —Antoine Jeter (Student 1-1 specialist) remained in this environment — D____ continued to work independently. At one point, he got up to sit near another student who was on the computer having completed her assignment (60 seconds). He next proceeded to take in the outside view from the front window of the classroom (30 seconds). He returned to his seat at the teacher's desk and resumed tackling his multiplication problems.
- When Ms. Green returned D____ suggested upon query that he had completed all problems. Ms. Green reviewed student's work, noted that he was not completely finished and instructed D____ to do so. Approximately three minutes later, D____ resubmitted assignment to which Ms. Green acknowledged completion. D____ was then allowed to go to the computer to interact with the other student who also had completed her assignment. The period ended shortly thereafter, and D____ transitioned successfully with classmates to his next class.

## INTERVIEWS WITH TEACHERS/OTHER ROCK CREEK ACADEMY STAFF:

The following persons were interviewed in preparation of this report:

Ms. Natalie Kepple (former Special Education Teacher) – This instructor, who was interviewed on October 5, 2006, received D____ during spring semester (2006) from Walker Jones Elementary School. She said that D____ is a very "hyper child" who is very playful and silly. He never had to be directed to the Crisis Room for behavioral issues. Verbal redirection was constant with mixed results. According to Ms. Kepple, D____ is a very likable child. She recalled that when prompting student (via physical contact) to move more quickly with classmates in group he had a tendency to suddenly go limp, as if he appreciated (or desired) the physical contact initiated by the instructor. Ms. Kepple also observed D____ at times go limp while seated at his desk. Student has a tendency to be careless when he lost focus in class. Teacher felt that D____ had the capability to perform class work when he was completely focused.

Ms. Tina Bradley (Music Teacher) – Ms. Bradley was briefly interviewed following observation of this student in music class (October 5, 2006). According to Ms. Bradley, D____ is a quick study, who has grasped the concept of drum notes and beat emphasis well. He enjoys playing the drum. Her primary concern centered on student's hyperactivity. He can be fidgety and require constant verbal redirection to which he favorably responds. Bradley claims that he is not a major behavior problem and in fact can be supportive of his classmates in the music class.

- 6 -

B█████, D█████ –FBA (October 2006)

<u>Mrs. Kori Constantian</u> (Occupational Therapist) – The Occupational Therapist was interviewed on the morning of October 6, 2006. Mrs. Constantian revealed she has been servicing student since the beginning of this school year. Therapist assesses that he is a very likable kid who brings a lot of energy to the therapy session. He has always transitioned successfully from his classroom. According to therapist, D█████ works well in OT. There may even be some questions whether he actually needs OT. In therapy, he is also very supportive of other students. Therapist suggests that he can be talkative & playful but generally responds when redirected via verbal prompts. Mrs. Constantian perceives D█████ as a typical energetic youngster. She surmises that if the school housed a typical physical education environment replete with gymnasium and open space, that D█████ could expend much of his energy in a healthy way and (conceivably) be less hyperactive in the classroom.

<u>Ms. Selma Woldemichael</u> (Special Education Teacher) – The aforementioned person was interviewed on the afternoon of October 6, 2006. Ms. Woldemichael received D█████ for the current school year and is his primary classroom teacher. According to her, student's hyperactivity is most evident in her classroom. As a result and due to playfulness, D█████'s focus is not always sharp, and he makes careless mistakes.

Student does comply with verbal prompts to get back on task. According to Ms. Woldemichael, he has never been a serious behavioral problem. Student has begun to mimic some of the in a comical way some of the behaviors of his classmates. In general D█████ gets along very well with all of his classmates and is supportive.

Ms. Woldemichael commented that D█████'s Point Sheet, Individual Behavioral Goal (IBG) is for student to, "Be aware of his Body Control;" teacher reports that he has a tendency to seek body contact when passing her desk and wanting to establish physical contact. Teacher also mentioned that D█████ is most neat in storing his books and personal items in his desk, more so than any of his other classmates and to the point where he will imply that neatness (from him) should be anticipated.

Ms. Woldemichael believes that D█████ is capable of performing social studies coursework. Review of her Performance Grade Book revealed that D█████ brings in Point Sheet and generally submits homework although it may be incomplete and not always correct.

Teacher has recently moved student's desk closer to her desk. Informed of his classroom observation (in Ms. Annunziata's class), Ms. Woldemichael hopes to determine if there is a correlation between student's hyperactivity, ability to focus in the classroom, and physical proximity to instructor to learn.

Ms. Woldemichael indicated that she (initially) had difficulty getting in contact with D█████ grandmother, Ms. Etta Jalloh, as there was home phone number was not listed in IEPPRO. Since then, D█████ has provided Ms. Woldemichael a telephone number where grandparent can be reached.

Case 1:07-cv-01359-RCL    Document 6-2    Filed 11/01/2007    Page 28 of 48

— 7 —

B████, D████ –FBA (October 2006)

Ms. Vonetta Long (Special Education Teacher) – Ms. Long, who was interviewed October 6, 2006 and teaches student Language Arts, describes him as a student who is capable of doing the work. While he submits homework, he seems to do it at school before class. It is often incorrect and incomplete. D████ is busy (hyper at times) but a very likable child who gets along well with classmates and is helpful with others. In her class, D████ responds well to verbal prompts to get back on tasks. He loses focus when he is fidgety and makes careless mistakes. Ms. Long strongly believes that D████ has the potential to excel.

Mrs. Paula Anderson (Clinical Therapist) – Mrs. Anderson was interviewed late on the afternoon of October 6, 2006. She began working with D████ this school year. He presents ADHD behavior, as he is usually in constant motion and fidgety. As a result, he has to be verbally prompted to get back on task. His movements distract others in the group therapeutic setting. According to Mrs. Anderson, D████ is not a behavioral problem. She perceives him to be a very likable child who needs to develop social functioning in a manner in which he less relies on body movement. He is respectful and mannerable seems to fully enjoy therapy and transitions well both to and from the therapeutic setting.

## ATTEMPTED COMMUNICATION WITH STUDENT'S GRANDPARENT:

Several efforts were made to contact Ms. Etta Jalloh, who is D████ grandmother and primary caretaker. At this writer, contact has not been established with Ms. Jalloh.

## RESULTS AND INTERPRETATION

D████ B████ is the student profiled in this Functional Behavioral Assessment. Previous clinical, Psychoeducational and psychiatric assessments have suggested that this student suffers with Attention-Deficit/Hyperactive Disorder. Previous reports also indicate that D████ displays insignificant, yet depressive symptoms that may be attributed to the death of an older asthmatic sibling; estrangement from his biological father; trauma from an alleged child abuse experience; and attempts to readjust to the departure of his mother from his grandparent's abode to her own home. Further compounding the accuracy of previous assessments is whether D████ special needs were met in a regular school setting, which not only was overcrowded but delinquent in implementing essential special education and related services. Recent ruling of DCPS HOD has only recently put in motion appropriate measures to educate and aid D████ in the special learning environment that was jointly recommended in Clinical and Psychiatric Evaluative Reports of December 2005.

At this juncture, no communication has been established with Ms. Etta Jalloh (grandmother), who is D████ primary guardian. Specific information about D████ behavior in the home, interpersonal relationships with other household and extended family members, frequency of contact with his biological father, the existence of or access to a viable male role model on a regular basis, the current but ongoing role of D████ mother in his life, and more information about disciplinary and behavioral measures imposed by grandparent and/or other adult persons in the home may shed additional light in fashioning an effective plan to successfully modify student's behavior.

## SUMMARY:

D████ B████ is a 10-year, two (2) month old African American male child who entered the Rock Creek Academy in the spring of the 2005-2006 school year. Notes from his most recent IEP Meeting, dated July 2006, reflect that his current Disability Category is *Specific Learning*

– 8 –

B████ D█████–FBA (October 2006)

*Disability, Emotionally Disturbed/Other Health Impairment.* A Functional Behavioral Assessment has been requested (in part) by the MDT to make sure that student has the correct disability classification and to ensure that he is receiving all appropriate services. Teachers, a teaching assistant and therapists who were interviewed for this report described a very active but likable youngster whose demeanor is often silly and playful. A correlation seemingly exists between D██████ inability to maintain focus in class and carelessness in responding to teacher's inquiry and submitting written work. There may also be concerns whether he is being monitored at home to complete homework assignments. Speculation has it that D██████ is rushing to complete some assignments when he arrives at school. He has submitted homework done incorrectly as well as assignments that are incomplete. There is also speculation that D██████ works with a tutor outside of school. When D██████ has turned in accurate and completed homework, there appears to be an expectation of him that is both monitored and achieved.

Student's clinical therapist voiced concerns that D██████ displays behavior that is characteristic of ADHD. His occupational therapist describes an energetic lad whose activeness is typical of boys his age. Collectively, persons interviewed have indicated that D██████ can be brought back on task via verbal prompts. Seemingly, a correlation exists as to what degree D██████ is energetic (fidgety to hyperactive) and the number of verbal prompts needed to bring him back on task (single command to multiple demands). Unanimously, none of the persons interviewed said that D██████ displayed serious behavioral problems, which warranted summoning the Behavioral Specialist and isolation in the Crisis Room. Student reportedly makes smooth transitions between classes and from class to and from therapy.

It is important to note that while D██████ has been in a "special educational setting" for only a short time, he seems to have tempered some of the more serious problem behavior that was manifested in a much larger, regular school setting. Interviewees also assessed their opinions that D██████ is capable of learning successfully in school. This might be attributed to the "small student-teacher class ratio" that was recommended in previous and most recent clinical evaluations. According to persons interviewed, D██████ gets along well with classmates, is helpful and supportive. An observation made in preparation of this report suggests that D██████ may thrive if his desk is placed as close to his teacher desk as possible. He seemed to maintain focus and was able to work independently for a much longer period of time. It might also prove beneficial if external supports could be assured to work with D██████ and his grandmother. Family counseling has been previously recommended, but it is unclear if it was fully utilized and if the family engaged in therapy for a significant period of time. A male mentor might also serve as viable role model for this youngster who based on available social history and evaluative information is being reared in a matriarchal household.

## RECOMMENDATIONS:

Based on these findings the following recommendations are suggested:

1. The Intervention Behavior Plan must be created by the MDT and implemented in D██████ IEP.
2. D██████ should continue to be afforded an educational setting with a small pupil to teacher ratio in order to support his academic strengths while addressing his learning impairments and social/emotional/behavioral needs.
3. D██████ should be provided in his educational setting with an opportunity for a high level one-to-one instruction that follows carefully on a day-to-day basis an individualized program that is carefully prepared to emphasize his strengths while delivering his Special Education program. In this setting a behavioral plan must be used consistently in all of his classes.

- 9 -

Brown, Daniel – FBA (October 2006)

4. Daniel should he provided emotional support throughout the day by individual and/or group counseling outside the classroom.

5. Daniel would most likely benefit from some sort of token economy system, such as that employed at Rock Creek Academy, wherein he may chart and track instances on appropriate and inappropriate behavior. This will also assist his teachers and corresponding staff members to track a more concrete and specific measure of problematic behavior and serve as a baseline to measure growth or deviation from desired "on-target" behaviors.

6. Daniel should continue receiving instruction in an educational setting with very regimented and organized classroom management. Additionally, Daniel requires a tracking chart to assure that he has appropriate materials for each class. This tracking chart must be monitored by each teacher to ensure staff corroboration. Additionally, visible lines of communication should be established to ensure that Daniel caretakers are aware of homework assignments and tests to augment the learning taking place in school. Eventually, the onus of responsibility will be placed solely on Daniel. All assignments and instruction must be given at an appropriate grade level for this student to ensure interest and success. In addition Daniel will require repeated instructions as well as other academic accommodations to present information to him and in order to ensure his comprehension of provided assignments. An incentive/reward system should be created for Daniel that not only will inspire him to take advantage of his competitive strengths but also help him to understand that the system is a "privilege" that is earned and can be taken away.

7. Daniel should be supplied with preferred activities that are contingent on participation in required curriculum activities.

8. Daniel should be provided with opportunities and time to rehearse desired appropriate behaviors.

9. Daniel desk should be moved as closely as possible to his instructor's desk in the classroom.

10. Daniel should be afforded a 1-1 mentorship with an adult male. Since he is assigned to and enjoys music stimulation (drum beating), consideration should be given to fashioning an activity using music sounds.

11. Clinical psychotherapy is respectfully recommended for Daniel as already determined by the MDT.

Anthony Smith, CADC II

30

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

April 2, 2007

Sherrie Waul
LEA for Rock Creek Academy
Office of Special Education
825 North Capitol, NE
Sixth floor
Washington, DC 20002
By fax: 202-442-5517

Re:    D█████ B█████

Dear Ms. Waul:

A due process complaint filed on behalf of this student has been scheduled to be heard at *9:00am on April 19th, 2007.* In order to meet their evidentiary burden under Section 3030.3 of Title V of the D.C. Municipal Regulations[1], the parent is respectfully requesting that your school provide our office with an opportunity to inspect, review, and copy the following records:

> All form 6s
> All standardized test scores, such as CTBS or SAT-9
> All evaluation reports and DCPS reviews, including triennial review
> IEPs, BLMDT, MDT notes, placement notices, and letters of invitations for all years in special education
> All report cards, including progress reports and attendance records
> All disciplinary records, incident reports, and manifestation determinations
> All encounter tracking forms
> A list of all of the student's special and general education teachers

Any other records or correspondence you believe are relevant.

As counsel for the parent, we are entitled to make this request pursuant to governing provision of the Individuals with Disabilities Education Act. *See* 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.613;[2] D.C. Mun. Regs. tit. 5 § 3021;[3] D.C.P.S. S.H.O. S.O.P. §800.2 .[4]

---

[1] "The burden of proof shall be the responsibility of the party seeking relief; either the parent/or guardian of a child or the LEA. Based solely upon the evidence presented at the hearing, an impartial hearing officer shall determine whether the party seeking relief presented sufficient evidence to meet the burden of proof that the action and/or inaction or proposed placement is inadequate or adequate to provide the student with a Free Appropriate Public Education (FAPE)."
[2] "The agency shall comply with a [records] request without unnecessary delay . . ., and in no case more than 45 days after the request has been made."
[3] "."

**DB9**

31

The parent respectfully requests that you contact our offices immediately in order to reach a mutually agreeable time and manner in which you will provide us with access to these records.

Our experience is that most schools prefer to provide our office with copies of these records by mail or fax. If you do not respond to our request within five (5) business days, we will assume that copies of the requested documents are forthcoming by either mail or fax.

**The parent also respectfully requests that our office be notified immediately as soon as any newly obtained records become available.**

Sincerely,

Camille McKenzie
Tyrka & Associates, LLC
1726 Connecticut Avenue, N.W., Suite 400
Washington, D.C. 20009
p. (202) 265-4260
f. (202) 265-4264

Enclosure:    Parent Authorization for Release of Documents

---

[4] "Parents have the right to examine all records maintained by the school that are related to their child. . . Parents may authorize counsel, advocates, investigators or other individuals to review and obtain copies of their children's records."

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

| | |
|---|---|
| *Recipient:* | Sherrie Waul ~ OSE |
| *Fax Number:* | |
| *From:* | Camille McKenzie |
| *Regarding:* | D▮▮▮▮ B▮▮▮▮ |
| *# of pages:* | 3 |
| *Notes:* | Due Process Hearing Records Request |

## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Associates or their client(s) that is intended solely for the recipient named above. If you are not the intended recipient named above or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Associates expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Associates. Thank you.

```
            ┌──────────────────────────────────────────┐
            │     TRANSMISSION VERIFICATION REPORT       │
            └──────────────────────────────────────────┘

                                    TIME   : 04/02/2006 06:27
                                    NAME   : TYRKA & ASSOCIATES
                                    FAX    : 2022654264
                                    TEL    : 2022654260
                                    SER.#  : 000A6J693992


   ┌──────────────────────────────────────────────────────────────┐
   │  DATE,TIME           04/02  06:27                              │
   │  FAX NO./NAME        2024425517                                │
   │  DURATION            00:00:47                                  │
   │  PAGE(S)             03                                        │
   │  RESULT              OK                                        │
   │  MODE                STANDARD                                  │
   │                      ECM                                       │
   └──────────────────────────────────────────────────────────────┘
```

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

*Recipient:*        Sherrie Waul ~ OSE

*Fax Number:*

*From:*             Camille McKenzie

*Regarding:*        D█████ B██████

*# of pages:*       3

*Notes:*            Due Process Hearing Records Request

**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

**Office of the Superintendent**
Office of the General Counsel
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002-4232
202-442-5000        Fax: 202-442-5098
www.k12.dc.us

April 11, 2007

Douglas Tyrka, Esquire
Tyrka & Houck, LLP
1726 Connecticut Avenue, N.W.
Suite 400
Washington, D.C. 20009

**DISCLOSURE STATEMENT**

**VIA e-mail: tyrka@tyrkalaw.com and/or**
**VIA FACSIMILE 301-951-4248**

**Subject: D▇▇▇ B▇▇▇**
**DOB: ▇▇▇/1996**
**Attending School: Rock Creek Academy**

Dear Mr. Tyrka:

At the upcoming due process hearing in the above-referenced matter scheduled for Thursday,
April 19, 2007 at 9:00 a.m. or any subsequent hearing, and pursuant to the Individuals with Disabilities
Education Improvement Act, Pub. L. No. 108-446 and 34 C.F.R. 300.509(a) (3) (or any subsequent
iteration thereof), in addition to any documents and witnesses disclosed by the parent, DCPS may rely
upon any of the following witnesses/documents[1], in addition to any documents and/or witnesses
previously disclosed by any party for any earlier hearing for this student and/or compelled below
pursuant to 34 CFR 300.509(a)(2) and 5 DCMR 3031.1(b):

**Witnesses**

Marla Oakes, Executive Director, Office of Special Education, DCPS and/or designee(s) –
**825 North Capitol Street, N.E., Washington, D.C. 20002; (202) 442-4800 – *same for all***
***Central Office staff***
Ruth Blake, Director, Non-public Unit, OSE/DCPS, and/or her designee(s);
Keesha Blythe, Supervisor, Non-public Unit, OSE/DCPS, and/or her designee(s);
Sherrie Waul, Placement Specialist Monitor, DCPS/OSE, and/her designee(s);
Kymberly Grafton, LEA/CRS, DCPS/OSE, and/her designee(s)

Pursuant to 34 C.F.R. 300.509(a)(2) and 5 DCMR 3031.1(b), DCPS hereby compels the
attendance of the below named individual as a necessary and material witness(es):

Etta Jalloh, mother

---

[1] Witnesses may testify by telephone.

35

**Page Two**
RE:   Due Process Hearing for D~~onald Burns~~

### Documents

| | | |
|---|---|---|
| DCPS-01 | Due Process Complaint Notice | Date: 02/15/2007 |
| DCPS-02 | Due Process Complaint Disposition w/ Meeting Notes | Date: 03/07/2007 |
| DCPS-03 | IEP Meeting Notes | Date: 06/08/2006 |
| DCPS-04 | IEP w/ Meeting Notes & Documented Level of Service | Date: 07/25/2006 |

DCPS reserves the right to object to expert testimony by any witness whose curriculum vitae has not been disclosed to the Office of the General Counsel for DCPS at least five (5) business days prior to the hearing. DCPS also reserves the right to examine any witnesses called or identified as a potential witness by the representative of the student as though the witness was called by DCPS.

DCPS furthermore reserves the right to rely upon and /or use any documents/witnesses presented and/or disclosed by the parent that DCPS deems relevant in this case.  Also, DCPS reserves the right to call rebuttal witnesses in its case.

If you wish to discuss any aspect of this case further, or have questions, please contact me at (202) 442-5604.

Sincerely,

Quinne Harris-Lindsey
Acting Supervisory Attorney Advisor

cc: Student Hearing Office

36

02/15/2007  15:20    202265426?

# DUE PROCESS COMPLAINT NOTICE
## In re D██████ B██████
### February 15, 2007

| | |
|---|---|
| **Petitioner:** | Etta Jalloh |
| **Student:** | D██████ B██████ |
| **DOB:** | ████/96 |
| **Current School:** | Rock Creek Academy ("RCA") |
| **Residence:** | 1125 First Terrace, N.W. |
| | Washington, DC 20001 |

**Petitioner's Contact Information for Special Education Purposes:**
Tyrka & Associates, LLC
1726 Connecticut Ave. N.W. Suite 400
Washington, D.C.  20009
Tel:  202-265-4260
Fax: 202-265-4264

2007 FEB 15 PM 3 20
DC PUBLIC
SCHOOL SYSTEM

**Violations:**

1.  Failure to review current evaluations in all areas of suspected disability.

FEB 16 PM 12: 45
RECEIVED
PUBLIC SCHOOLS
SERVICES BRANCH

**Facts:**

1.  At a July 25, 2006 meeting:
    a)  the multidisciplinary team ("MDT") determined that a current functional behavioral
        assessment ("FBA") of D██████ was warranted;
    b)  DCPS delegated its responsibility for completing this assessment to RCA;
    c)  the Petitioner signed a written consent form authorizing the completion of this
        assessment.
2.  On October 10, 2006, RCA completed an FBA of D██████
3.  DCPS has not convened an MDT meeting to review the results of D██████ FBA since
    October 10, 2006.

**Proposed resolution:**

1.  DCPS to immediately convene an MDT meeting to:
    a)  review the results of D██████ FBA;
    b)  develop an appropriate compensatory education plan to compensate D██████ for its failure
        to review the results of D██████ FBA since October 10, 2006.
2.  DCPS to pay reasonable attorney fees and costs incurred in bringing and pursuing this case.

**Resolution Meeting:**

1.  The Petitioner contends that a representative of the LEA with authority to:
    a.  immediately convene an MDT meeting and

DCPS - 01    02/08

37

     b.  negotiate attorneys' fees for work performed prior to the resolution meeting is a necessary attendee at any resolution meeting.

2. If this individual is not going to be in attendance, Petitioner requests that DCPS provide counsel with a written notice waiving its right to a resolution session 48 hours prior to any scheduled meeting.

3. The Petitioner contends that any meeting not attended by the identified individual is not a valid resolution session, but rather an informal settlement discussion.

4. The Petitioner will be accompanied by his or her attorney at any resolution session convened subsequent to the filing of this complaint and will record any resolution session by analog or digital means.

5. Any statements by the Petitioner or his or her representative during any resolution meeting or other settlement discussion incident to the filing of this complaint are for the purposes of compromise only.

                  Respectfully submitted,

                  Douglas Tyrka, #467500
                  Tyrka & Associates, LLC
                  1726 Connecticut Ave NW, Suite 400
                  Washington, DC  20009
                  (ph) (202) 265-4260
                  (f) (202) 265-4264

38

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID) Special Education**
**Programs**



# *Due Process Complaint Disposition*

- This form should be used by the parties to notify the Student Hearing Office about important information concerning the outcome of the resolution meeting.
- Please return to the Student Hearing Office of the District of Columbia Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002, Fax number 202/442-5556.

**A.** <u>**STUDENT AND CASE INFORMATION:**</u>

Student Name: D▓▓▓▓  B▓▓▓▓      Birth Date: ▓▓▓-96
          First    MI    Last

SHO Case Number: [ ]      (if applicable)

**B.** <u>**PARENT / GUARDIAN:**</u>

Name: Etta                         Jalloh
       First                                 Last

Complete Address: 1125 First Terrace, NW
Washington, DC 20001

Phone: [ ]       [ ]
    Home         Work or alternative phone no.     Fax No. if applicable

**C.** <u>**LOCAL EDUCATION AGENCY REPRESENTATIVE:**</u>

Full Name: Kymberly   Grafton    Title: LEA, CRS

Address: 825 North Capitol Street, NE 6th Floor
Washington, DC 20002

Phone: (202) 442-4800      (202) 442-5517
         Office                Fax

1

SEID DRN Rev'd. 6/14/05

DCPS-02    03128
39

_____ The complaint has been resolved and the parties have reached agreement to the satisfaction of the parent / guardian. The due process complaint notice and the request for a due process hearing should be dismissed and withdrawn. The parties are aware that the agreement may be voided by any party within 3 business days of the date the agreement is signed. The parties have agreed to wait at least 3 business days before filing this form with the Student Hearing Office.

__X__ The resolution session was unsuccessful. The case should proceed to a due process hearing.

_____ The resolution session was unsuccessful. The parties have agreed to try mediation.

_____ The parties mutually agree to waive the resolution session and request mediation and the assignment of a mediator to this case.

_____ The parties mutually agree to waive the resolution session and request that this case proceed to a due process hearing on the merits.

_____ The parent has failed to participate in a resolution meeting as required under the law. A due process hearing should not be scheduled until further notice

## J.    Signature and Affirmation:

I affirm that the information provided on this form is true and correct. I also affirm my receipt of the Procedural Safeguards Manual or I have waived my right to receive the Procedural Safeguards Manual.

Signature of Parent/Guardian _____     Date 3/7/07

Local Educational Agency Representative _____     Date 3-7-07

**Mail, fax or deliver this form to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

2

SEID DRN Rev'd. 6/14/05

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

__ PUBLIC          __ DCPS CHARTER          __ LEA CHARTER          _x_ NONPUBLIC          ___ PRIVATE/RELIGIOUS

## RESOLUTION MEETING NOTES

Meeting Confirmation Date: [          ]          Meeting Held: [ 3-7-07 ]

Student: D████ B████          DOB: [ ████-96 ]          [ Rock   Creek ]

| PARTICIPANTS: (Print Name) | PARTICIPANTS (Sign Name) | POSITION |
|---|---|---|
| Kymberly Grafton | *(signature)* | LEA/CRS |
| Etta Jalloh | *(signature)* | Mother (via phone) |
| Sharon Millis | *(signature)* | Advocate |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

[   ] Resolved          [ X ] Unresolved

Introductions were made at the meeting. The parent's complaint is DCPS failed to review current evaluations in all areas of suspected disability. Attorney's fees were not discussed during the session.

DCPS proposes to convene an MDT meeting in which the Functional Behavioral Assessment is reviewed, Behavior Intervention Plan is developed if necessary, IEP is revised as necessary, placement and comp ed are discussed, and an new prior notice and/or comp ed plan are developed if necessary.

The parent rejected DCPS' proposal and will proceed to due process. This case is unresolved. The parent is seeking all the relief listed in the complaint. Parent is willing to participate in any meetings scheduled by DCPS.

1) ~~D____ B____~~    RS 3/7/07

DCFS states that they will convene a
MDT to review FBA, BIP, discuss
comp ad and counseling, discuss
placement but there is no time frame
was given and Attorney fees/costs were
not discussed. Parent does not give up
right to DPH but will cooperate with DCFS

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**

**INDIVIDUALIZED EDUCATION PROGRAM**
**(IEP)**
**MEETING NOTES**

STUDENT: __B████ D████__      SCHOOL: __Rock Creek Academy__      DATE: __6/8/2006__

| PARTICIPANTS | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Dr. Hannah Thomas | _____ | Clinical Psychologist |
| Ms. McKenzie | _____ | Special Educator |
| Ms. Page | _____ | IEP Coordinator |
| Ms. Poindexter | _____ | OTR/L |
| Ms. Kepple | _____ | Special Educator |

The team was prepared to move forward, however advocate was not in attendance and Ms. Jalloh was going to participate by phone. DCPS was in attendance by participating by phone. Rock Creek Academy would like to have devised an SEP plan and update his IEP. De███ is a student that requires special education services and his Psychiatric evalution recommends counseling.

In addition, DCPS was prepared to discuss Comp Ed. Plan.

DCPS-03

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.
INDIVIDUALIZED EDUCATIONAL PROGRAM

### I. IDENTIFICATION INFORMATION

Student Name: Last _B████_ First: _D████_ MI: __
StudentID: _9071176_ Soc. Sec. No.: __ Age: _10_ Grade: _05_
Gender: _M_ Date of Birth: _████/1996_ Ethnic Group: __
Address: _1125 First Terrace N.W., Washington, D.C. 20001_
☐ Non-attending
Attending School: _Rock Creek Academy_ Home School: __
☑ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS
Parent: _Etta Jalloh_

Address of: ☐ Parent ☑ Guardian ☐ Surrogate
_1125 First Terrace N.W., Washington, D.C. 20001_
Telephone: Home __ Telephone: Work __

**II. CURRENT INFORMATION**
Date of IEP Meeting: _7/25/2006_
Date of Last IEP _4/27/2005_
Meeting:
Date of Most Recent _7/25/2006_
Eligibility Decision:
Purpose of IEP Conference:

☐ Initial IEP            ☑ Review of IEP

☑ Requested Eval        ☐ 3yr ReEval.

Indicate Level of Standardized Assessment:
ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)
☐ BEHAVIOR            ☑ ESY
☑ TRANSPORTATION      ☐ TRANSITION

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | Native Language | Oral N/A |
| Parent | English | English | Spanish | Native Language | Rdg./Written Instrument Date |
| Home | English | English | English | Native Language | |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SpEd | Total | FREQUENCY Hr./Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # | wks/mos |
|---|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | ☐ | ☑ | 25.25 | hr | W | Special Educator | 06/08/2006 | 11 | mos |
| Clinical Therapy | ☐ | ☑ | 1.5 | hr | W | Psychologist/Social Worker | 07/25/2006 | 11 | mos |
| Occupational Therapy | ☐ | ☑ | 0.75 | hr | W | Occupational Therapist | 07/25/2006 | 11 | mos |
| | Total | 27.5 | Hours Per Week | | | | | | |

### V. DISABILITY(IES)

Emotional Disability, Specific Learning Disability, Other Health Impairment
☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☐ 0-20% ☐ 21-60% ☑ 61-100%
Percent of time NOT in Regular Education Setting _100%_

### VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Sherrie Waul, DCPS-LEA Monitor _____ _____
Arvette D. Page, IEP Coordinator _____ _____
Etta Jalloh, Educational Advocate _____ _____
Ms. Kepple, Special Educator _____ _____
Ms. Sharon Millis, Educational Advocate _____ _____

☑ *I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of hte procedureal safeguards and parent rights pertaining to special education.
Parent/Guardian Signature_____ Date_____

## VII. PRESENT EDUCATIONAL PERFORMANCE LEVELS IN AREAS AFFECTED BY THE DISABILITY

**Academic Areas: (Evaluator)**Ms. McKenzie
**Math Strengths:**
D████can do basic math operations such as addition, subtraction and multiplication. He has a very positive attitude and is proud of himself when can complete work. He responds well to one on one assistance.
**Impact of disability on educational performance in general education curriculum:**
D████ has difficulty sitting in his seat and coming to and maintaining attention which interferes with his ability to complete class assignments, and learning new material. He often lags way behind the other students in his class.
**Reading Strengths:**
D████can decode multisyllabic words and can write complete senetences.

**Impact of disability on educational performance in general education curriculum:**

**Score(s) When Available**
Math Cal. _78_ _2.8_
Math Rea. _83_ _1.8_
Date _12/21/2004_
Rdg. Com. _74_ _1.2_
Rdg. Basic _80_ _1.7_
Written Ex. _93_ _2.8_
Date _12/21/2004_

D8PS-04

D█████ inattention and impulsivity interfer█ █th his ability to comprehend and learn new material.

| | Score(s) When Available |
|---|---|
| **Communication (Speech & Language): (Evaluator)**<br>**Strengths:**<br>**Impact of disability on educational performance in general education curriculum:** | Exp. Lang. __ __<br>Rec. Lang. __ __<br>Artic. __ __<br>Voice __ __<br>Fluency __ __<br>Exp. Voc. __ __<br>Rec. Voc. __ __<br>Date __ |
| **Motor/Health: (Evaluator)**<br>**Strengths:**<br>**Impact of disability on educational performance in general education curriculum:** | __ __<br>__ __<br>Date __ |
| **Social Emotional Behavioral Areas: (Evaluator)**<br>**Strengths:**<br>**Impact of disability on educational performance in general education curriculum:** | __ __<br>__ __<br>Date __ |
| **Cognitive/Adaptive Behavior: (Evaluator)**<br>**Strengths:**<br>**Impact of disability on educational performance in general education curriculum:** | __ __<br>__ __<br>Date __ |
| **Prevocational Skills: (Evaluator)**<br>**Strengths:**<br>**Impact of disability on educational performance in general education curriculum:** | __ __<br>__ __<br>Date __ |

## VIII. SPECIALIZED SERVICES

Goal Number: __1__

**ANNUAL GOAL: (including mastery criteria)**     Area Addressed By Goal: __Math__

D█████ will demonstrate up to one year's growth in Mathematics as demonstrated by his scores on the WoodCock Johnson test.

**Provider(s):** Special Education Teacher

☑ Portfolio  ☐ Log  ☐ Chart  ☑ Test  ☑ Documented Observation  ☐ Report  ☑ Other oral answers

**SHORT-TERM OBJECTIVE: (including mastery criteria or benchmarks)**
Given 10 addition problems with 4 digit addends requiring 2 or more re-groupings, D█████ will solve 8 out of 10 correctly on 3 out of 5 trials.
**Date Mastered:  Evaluation Schedule:** __Monthly__

**SHORT-TERM OBJECTIVE: (including mastery criteria or benchmarks)**
Given 10 subtraction problems with 4 digit minuends and subtrahends, requiring 2 or more re-groupings, D█████ will solve 8 out of 10 correctly on 3 out of 5 trials.
**Date Mastered:  Evaluation Schedule:** __Monthly__

**SHORT-TERM OBJECTIVE: (including mastery criteria or benchmarks)**
D█████ will orally demonstrate quick recall of multiplication facts 0-12 with 80% accuracy on 3 out of 5 trials.
**Date Mastered:  Evaluation Schedule:** __Monthly__

**SHORT-TERM OBJECTIVE: (including mastery criteria or benchmarks)**
Given 10 division problems with a 3 digit dividend and 1 digit divisor, D█████ will solve 8 out of 10 problems with and without a remainder on 3 out of 5 trials.
**Date Mastered:  Evaluation Schedule:** __Monthly__

**SHORT-TERM OBJECTIVE: (including mastery criteria or benchmarks)**
Given 10 math problems, D█████ will identify and match equal fractions including mixed numbers with 80% accuracy on 4 out of 5 trials.

Case 1:07-cv-01359-RCL     Document 6-2     Filed 11/01/2007     Page 46 of 48

**SHORT-TERM OBJECTIVE: (including mastery criteria or benchmarks)**
Given 10 math problems, D█████ will identify and match equal decimals with 80% accuracy on 3 out of 5 trials.
**Date Mastered:   Evaluation Schedule:**  Monthly

**VIII. SPECIALIZED SERVICES**

Goal Number: __2__

**ANNUAL GOAL: (including mastery criteria)**                    Area Addressed By Goal: __Math__

D███ will demonstrate up to one year's growth in his Mathematics reasoning skills as demonstrated by his scores on the Woodcock Johnson test.

**Provider(s):** Special Education Teacher

☑ Portfolio  ☑ Log  ☐ Chart  ☑ Test  ☑ Documented Observation  ☐ Report  ☑ Other oral answers

**SHORT-TERM OBJECTIVE: (including mastery criteria or b**

DIST. T OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT: B____, D____    SCHOOL:  Rock Creek Academy    DATE:  7/25/2006

| PARTICIPANTS | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Etta Jalloh | _____ | Mother |
| Sharon Millis | _____ | Educational Advocate |
| Ms. Page | _____ | IEP Coordinator |
| Mrs. Waul | _____ | DCPS-LEA Monitor |
| Ms. Kepple | _____ | Special Education Teacher |

The purpose of today's meeting is to update his IEP and discuss his overall academic and behavioral progress. DCPS and advocate is in attendance, and parent will participate by phone. The team will also discuss compensatory education plan.

Ms. Kepple, Special Educator: Is D____ language art and reading teacher. In reading and writing he is functioning on the third grade level. His comprehension is good if he is focused. He can be very fidgety and impulsive. He is currently on level 2 for his behavior. Ms. Kepple created goals for him in the area of reading and written language. He needs to increase his spelling skills with long vowel patterns and use contractions correctly. In addition, he doesn't always put capitalization and punctuation not because he doesn't know, but because he's not paying close attention. D____ has a couple of close friends. Generally he is quieter with the other students, but for the most part his interactions with his peers is positive. When displaying silly behavior he can be easily redirected. D____ responds well to praise and rewards.

Based on clinical evaluation that was completed December 8, 2005; it was recommended by evaluator that D____ should receive .5 per/wk, 3x's which equates 1.5 hours per/wk of counseling services. Counseling was not added to IEP dated 4/27/2005, and testing was not done which prevented him from getting the services that he needs. DCPS is offering 125 specialized instruction and 40 for clinical therapy to be divided individually and group. 20 hours for individual and 20 hours group therapy. DCPS is asking for 30 days to implement the tutorial and counseling piece and if it is not implemented then the parent and advocate is asking for an independent tutor within the superintendents cost guidelines.

MDT determined that all of D____ evaluations are current. He is a student that requires special education services he will receive 26.0 hours per/wk of specialized instruction and 1.5 hours per/wk of clinical therapy. His placement will continue to be Rock Creek, and his accomodations is small group, repeated directions, extended time. MDT agreed to devise SEP for a Functional Behavior Assessment.

State Education Agency for the District of Columbia
State Enforcement and Investigation Division (SEID)
Special Education Programs

D████ B████, DOB: ████/1996

    Petitioner,

v.

District of Columbia Public Schools

    Respondent

### District of Columbia Public School's Response to
### Parent's Administrative Due Process Complaint Notice

The District of Columbia Public School (hereinafter "DCPS"), by and through the undersigned Attorney Advisor, hereby provides its Response to the Administrative Due Process Complaint Notice ("Complaint") filed on or about February 15, 2007 on behalf of the parent of D████ B████, DOB: ████/1996 (DCPS-01), pursuant to the Individual's with Disabilities Education Improvement Act (hereinafter "IDEA 04"), 20 U.S.C. §1415(c)(2)(B)(i)(I).[1] Specifically, DCPS asserts the following:

1. DCPS denies that it has failed to review the student current evaluations in all areas of suspected disability. Specifically, DCPS states that the student is currently identified as a student with Emotional Disturbance. He has a current psychiatric evaluation, clinical evaluation and functional behavior assessment (FBA). As of July 25, 2006, the student's school noted that all of his evaluations are current. The only action that has not occurred to date it that the MDT has not met to review the student's FBA. Nonetheless, the student remains at a full-time, day program that provides him 26 hours of specialized instruction, 1.5 hours per week of clinical therapy.

2. DCPS proposed a compensatory education plan on July 25, 2006 or, in the alternative, afforded the parent the right to an independent tutor.

3. Nothing has occurred that would warrant an additional award of compensatory education.

---

[1] DCPS acknowledges that this response was required to be filed on or before February 26, 2007; however, the delay in filing this response has not impacted the student's educational program or services. Therefore, it is the position of this agency that the delay in providing said response has not resulted in a denial of FAPE to the student. Complaint attached as DCPS-01.

In re D███ B█████
Response to Due Process Complaint Notice
Page 2

Date: April 11, 2007               Submitted by:


_____/s/_____
Quinne Harris-Lindsey, Esquire
Supervisory Attorney Advisor
Office of the General Counsel
825 North Capitol Street, N.E., 9th Floor
Washington, D.C.  20002
(202) 442-5604 – direct
(202) 442-5098 – fax


## CERTIFICATE OF SERVICE

I, Quinne Harris-Lindsey, Esq., hereby certify that a copy of DCPS' Response to the

Administrative Due Process Complaint Notice was served on April 11, 2007 on Douglas Tyrka,

Tyrka & Houck, LLP, via e-mail at Tyrka@tyrkalaw.com.


_____/s/_____
Quinne Harris-Lindsey, Esquire

2

50

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8ᵀᴴ Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



#### HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:    Parent (or Representative):  *D. TYRKA*          Fax No.:  *265-4264*

       LEA Legal Counsel:  *OGC*

RE:    B̶▓▓▓▓ J̶▓▓▓▓          and (LEA)  DOB:  ▓▓▓▓/96
       Student's Name

FROM:    **SHARON NEWSOME**
         Special Education Student Hearing Office Coordinator

DATE SENT:    *4/2/07*

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on *3/15/07*. Please be advised that the hearing has been scheduled for:

       DATE:    *4/19/07*

       TIME:    *9:00 Am*

       AT:    825 North Capitol Street, NE, Washington, DC
              8ᵀᴴ Floor

       ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made *exclusively* by the Hearing Officer, and cannot be made by SHO administrative staff. Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[X] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of evidence and witnesses to the opposing party is required at least <u>five business days</u> prior to the hearing with copies to the Special Education Student Hearing Office.

51

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUCLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney:Douglas Tyrka, Esq.**
**Parent: Etta Jalloh**

Telephone Number: **(202) 265-4260**          Pages: **3**
Fax Number: **(202) 265-4264**          Date: **February 15, 2007**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **D▆▆▆▆ B▆▆▆▆**

School: **Attending Rock Creek Academy**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office. If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556. Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

**Thank You**
**Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally
privileged. The information is intended only for use of the individual or entity named Above, if you are not the
intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in
reliance of the contents of this copied information is Strictly prohibited. If you receive this telecopy in error, please
immediately notify us by telephone For return of the original document to us.

# STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| B■■■, D.            Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| DCPS | ) | |
| Attending Rock Creek Academy | | |
| | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1. A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **<u>The Student Hearing Office does not schedule or participate in resolution meetings</u>**.

2. The complaint notice was filed on **February 15, 2007**

3. The deadline for the resolution meeting is **March 2, 2007** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A. ***Prior Written Notice Not Issued by the Local Educational Agency***.  If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

   1. An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
   2. A description of other options that the IEP Team considered and the reasons why those options were rejected;
   3. A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

Rev'd. 7/6/05

4.      A description of the factors that is relevant to the agency's proposal or refusal.

B.      Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **February 25, 2007**.

C.      *Deficiency Notice*.  A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, within 15 days of receiving the notice of the complaint, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

The deadline for filing a deficiency notice is **March 2, 2007**.

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.  A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice.  The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.  The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Rev'd. 7/6/05

54

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

| | |
|---|---|
| **Recipient:** | SHO |
| **Fax Number:** | |
| **From:** | Douglas Tyrka |
| **Regarding:** | D▮▮▮▮, B▮▮▮▮ (D.O.B. ▮▮▮▮/96) |
| **# of pages:** | 3 |
| **Notes:** | Due Process Complaint |

2007 FEB 15 PM 3: 20
DC PUBLIC
SCHOOL SYSTEM

**CONFIDENTIALITY NOTICE**

This facsimile contains confidential information belonging to Tyrka & Associates or their client(s) that is intended solely for the recipient named above. If you are not the intended recipient named above or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Associates expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Associates. Thank you.

55

02/15/2007  15:20    2622654260                    TYRKA & ASSOCIATES

**DUE PROCESS COMPLAINT NOTICE**
In re D~~amisA B~~
**February 15, 2007**

| | |
|---|---|
| Petitioner: | Etta Jalloh |
| Student: | De~~mish B~~ |
| DOB: | ~~/96 |
| Current School: | Rock Creek Academy ("RCA") |
| Residence: | 1125 First Terrace, N.W. |
| | Washington, DC 20001 |

2007 FEB 15 PM 3:20
DC PUBLIC
SCHOOL SYSTEM

**Petitioner's Contact Information for Special Education Purposes:**
Tyrka & Associates, LLC
1726 Connecticut Ave. N.W. Suite 400
Washington, D.C. 20009
Tel:  202-265-4260
Fax: 202-265-4264

**Violations:**

1.  Failure to review current evaluations in all areas of suspected disability.

**Facts:**

1.  At a July 25, 2006 meeting:
    a) the multidisciplinary team ("MDT") determined that a current functional behavioral assessment ("FBA") of D~~ was warranted;
    b) DCPS delegated its responsibility for completing this assessment to RCA;
    c) the Petitioner signed a written consent form authorizing the completion of this assessment.
2.  On October 10, 2006, RCA completed an FBA of D~~
3.  DCPS has not convened an MDT meeting to review the results of D~~ FBA since October 10, 2006.

**Proposed resolution:**

1.  DCPS to immediately convene an MDT meeting to:
    a) review the results of D~~ FBA;
    b) develop an appropriate compensatory education plan to compensate D~~ for its failure to review the results of D~~ FBA since October 10, 2006.
2.  DCPS to pay reasonable attorney fees and costs incurred in bringing and pursuing this case.

**Resolution Meeting:**

1.  The Petitioner contends that a representative of the LEA with authority to:
    a. immediately convene an MDT meeting and

56

      b.  negotiate attorneys' fees for work performed prior to the resolution meeting
is a necessary attendee at any resolution meeting.

2.  If this individual is not going to be in attendance, Petitioner requests that DCPS provide
counsel with a written notice waiving its right to a resolution session 48 hours prior to any
scheduled meeting.

3.  The Petitioner contends that any meeting not attended by the identified individual is not a
valid resolution session, but rather an informal settlement discussion.

4.  The Petitioner will be accompanied by his or her attorney at any resolution session convened
subsequent to the filing of this complaint and will record any resolution session by analog or
digital means.

5.  Any statements by the Petitioner or his or her representative during any resolution meeting or
other settlement discussion incident to the filing of this complaint are for the purposes of
compromise only.

                     Respectfully submitted,

                     Douglas Tyrka, #467500
                     Tyrka & Associates, LLC
                     1726 Connecticut Ave NW, Suite 400
                     Washington, DC  20009
                     (ph) (202) 265-4260
                     (f) (202) 265-4264

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE


IN THE MATTER OF

 D⬛⬛ B⬛⬛


HEARING DATE:   APRIL 19, 2007


TRANSCRIBED BY
LEGAL PERSONNEL, INC.   (301) 277-5711

## APPEARANCES

                                                                    PAGE

HEARING OFFICER:  Charles R. Jones . . . . . . . . . . . . . . .   3,81

ATTORNEY ADVISOR FOR D.C. PUBLIC SCHOOLS:  Gwen Harris Lindsay .   3,80

ATTORNEY FOR PARENT:  Douglas Turker  . . . . . . . . . . . . .   3,78

WITNESS:  Sharon Millis  . . . . . . . . . . . . . . . . . . .     38

_____

2

59

1                              <u>PROCEEDINGS</u>

2

3    [Hearing convenes at 9:11 a.m.]

4         HEARING OFFICER:  Alright we're on the record.  It is now

5    9:11 on April the 19th, 2007.  My name is Charles R. Jones and

6    I'm a hearing officer, and I'm convening an administrative due

7    process hearing on behalf of D███ B███.  This hearing is

8    being conducted in accordance with the guidelines and rights

9    established by idea, the rules of the Board of the Education

10   of the District of Columbia, and the D.C. Appropriations Act.

11        Now, for the purposes of the record I would like everyone

12   to introduce themselves, counsel for DCPS?

13        MS. LINDSAY:  Gwen Harris Lindsay, attorney advisor on

14   behalf of D.C. Public Schools.

15        MR. TURKER:  Good morning Douglas Turker, counsel for the

16   parent.

17        HEARING OFFICER:  Alright Mr. Turker, are we ready to

18   inform the parent with the due process rights?

19        MR. TURKER:  Yes.

20        HEARING OFFICER:  At the conclusion of this hearing

21   within 10 calendar days, or within the 45 day limit, I will

22   prepare an order.  The order is appeal able by either party

23   through the court of law.

1        Now I have two disclosure documents, one with the date,

2    April 12th, the other April 11th.  Do either of you counsels

3    have any problems with sub-miss-ability?

4        MR. TURKER:  No objection.

5        MS. LINDSEY:  No.

6        HEARING OFFICER:  Alright, both of the disclosures are

7    entered into the record, with no objections by either party.

8        Mr. Turker, is the parent going to be available?

9        MR. TURKER:  She's available by phone.

10       HEARING OFFICER:  Okay.  Why don't you put her name down

11   and just put availability by phone.

12       MR. TURKER:  Okay.

13       HEARING OFFICER:  I've read your complaint with regard to

14   failure of the DCPS to review a functional behavioral

15   assessment.  Is that correct?

16       MR. TURKER:  Correct.

17       HEARING OFFICER:  Is that the only evaluation that has

18   not been reviewed?

19       MR. TURKER:  That's the only existing evaluation that has

20   not been reviewed, correct.

21       HEARING OFFICE:  Okay.

22       MR. TURKER:  I think DCPS admitted to the failure to

23   review within their response, which I believe they provided

24   the hearing officer with a copy of.

4

1          HEARING OFFICER:  Okay.  Are there any preliminary

2     matters?

3          MR. TURKER:  None for us.

4          MS. LINDSAY.  No.

5          HEARING OFFICER:  Alright, I know you have requested the

6     summary judgment on this matter, Mr. Turker.

7          MS. LINDSAY:  I'm sorry, there was a summary judgment

8     motion filed?

9          HEARING OFFICER:  Yes.

10         [Whispering off the record.]

11         HEARING OFFICER:  Alright, umm, I'll defer that, my

12    decision on that.  Let me just hear some of what's going on

13    Rock Creek.  Tell me what are the concerns you'd have with

14    regard to the FBA and the fact that they're his, and some

15    denial of fate as a result of the failure to review his

16    evaluation?

17         MR. TURKER:  Sure.  Well we've got two, well actually

18    three different issues.  One is that, I think as we've already

19    worked out here before, it's always, I think it's no even an

20    impossibility for any side to argue about fate, when the

21    evaluation hasn't been reviewed, because we don't know what

22    the review of the evaluation will result.  So, I think that

23    there needs to be - - I think the burden needs to be on DCPS

1   to establish that there was no denial of fate, as the result

2   of the failure to do what they're required to by law.

3       Also, regulations make clear that part of fate is full

4   participation in the decision-making processed.  And

5   evaluation under review with the parent, we think that is

6   virtually a denial of fate.

7       In this particular issue, in this particular case, the

8   Rock Creek has an behavioral management program for all of its

9   students.  And as we approaches its education, it does adjust

10  that behavioral management based on each child's needs.  And

11  as we know for our children for behavioral issues, those

12  specific needs are usually laid out in the behavioral

13  intervention plan developed after an FBA.  So that has not

14  been fully completed here.

15      HEARING OFFICER:  What's the disability classification of

16  the student?

17      MR. TURKER:  Right now he is ED LD, I don't want to be

18  quoted on that.  If you give a second, I can tell you.  Sorry,

19  LD OHI.  And the third issue in this case is that DCPS has

20  since the filing of the complaint, agreed that their own FBA

21  needs to be redone.

22      HEARING OFFICER:  Did you guys have a resolution meeting

23  in this?

24      MS. LINDSAY:  Yes.

1      MR. TURKER:  Yes, there was a meeting.

2      HEARING OFFICER:  So there was a resolution meeting?

3      MR. TURKER:  Correct.

4      HEARING OFFICER:  Alright.

5      [Pause.]

6      MR. TURKER:  So in defining the complaint, DCPS has

7  determined that it's FBA needs to be amended.  It also

8  determined that it needs to do other evaluations, including a

9  clinical and a psychol Ed.

10      HEARING OFFICER:  Is that part of your disclosure letter?

11      MR. TURKER:  No, this just happened yesterday.  So, I

12  don't need that to make part of this case, but I just wanted,

13  that's jut part of the disclosure for the hearing officer.  So

14  in this case we would ask for the relief of but instead of an

15  immediate meeting, a meeting to determine - - a meeting for

16  all purposes, including the determination of comp ed,

17  following the completion of a new evaluations.

18      HEARING OFFICER:  Alright, let me ask you a couple of

19  questions of, first, you indicated that you believe that base

20  on the fact the DCPS has admitted to its failure to review the

21  FBA, that that is a per se violation, correct?

22      MR. TURKER:  Yeah.

1      HEARING OFFICER:  And that that in itself, it's just a

2  burden to DCPS to determine whether or not there has been a

3  denial of fate, is that correct?

4      MR. TURKER:  Correct.

5      HEARING OFFICER:  Now we all realize that there are some

6  procedural issues that came out of the new 2004 amendment.

7  And it did say in that particular Act that procedural

8  omissions are not in and of themselves a denial of fate.

9      MR. TURKER:  Correct.

10     HEARING OFFICER:  What else did they say Mr. Turker?

11  What is that law, what is that new amendment placed on the

12  burden of parents as a result of a procedural default?

13     MR. TURKER:  Well the amendment - -

14     HEARING OFFICER:  Omission, I wouldn't say default.

15  Omission.

16     MR. TURKER:  The amendments didn't place a burden of

17  proof on the parent.  If you're referring to the change in the

18  - -

19     HEARING OFFICER:  No, no, no, no.  No it didn't, well,

20  you know how - -

21     MR. TURKER:  Well a year later that was correct.

22     HEARING OFFICER:  Right.  But what that new amendment did

23  was it also said that there are some additional hurdles that

8

65

1  have to be crossed, or jumped, or whatever you wanna say, when

2  there is a procedural omission.

3      MR. TURKER:  Correct.

4      HEARING OFFICER:  Those omissions per se don't amount to

5  a denial of fate, correct?

6      MR. TURKER:  Correct.  I don't contend it as a

7  substantive violation, not a procedural violation.

8      HEARING OFFICER:  Okay.

9      MR. TURKER:  I mean procedural violation would be

10 something like failure have a particular person at an IEP

11 meeting; failure to provide notice on a particular form, for

12 example, there's case law discussing, you know, how does the

13 absence of prior notice affect debate.  And there are case

14 that say, alright maybe you didn't do exactly on the form what

15 you were supposed to do, but, you have these long conversation

16 and you gave the parent two letters.  And all of that

17 constituted a prior notice, even though if he didn't do

18 exactly what he was supposed to do.  I think that's the kind

19 of procedural violation they're talking about.

20     HEARING OFFICER:  What's your response to them?

21     MR. TURKER:  But regulations do make - - when the

22 regulation defines the hearing officer's power to find a

23 denial of fate, they include in that, participation in the

9

66

1    decision making process and access to a fate.   So there is the

2    direct fact and there is access to a fate.

3         HEARING OFFIFCER:  Right.

4         MR. TURKER:  And when an evaluation hasn't been done or

5    hasn't been reviewed, there is a denial about access and a

6    denial of the decision-making.

7         HEARING OFFICER:  How do you - - well, let me ask Ms.

8    Lindsay, What's you're response to this?

9         MS. LINDSAY:  The burden hasn't shifted.  That's the

10   first thing I think counsel is in error by saying that based

11   on the claim that was made - -

12        HEARING OFFICER:  That mike up to you.

13        MS. LINDSAY:  Based on the claim that was made - -

14        HEARING OFFICER:  Today, you're quiet.

15        MS. LINSAY:  No, it - -

16        HEARING OFFICER:  So you're this maybe a morning scenario

17        MS. LINDSAY:  No, enjoy it.

18        HEARING OFFICER:  Okay.

19        [Laughter.]

20        HEARING OFFICER:  Is that your response that, you're

21   crazy.

22        MS. LINDSAY:  That, yeah, it'll last for a minute.

23        HEARING OFFICER:  Alright go ahead.

67

1      MS. LINDSAY:  Based on the claim that's made, this burden

2   has shifted to the DCPS, and the law states that the burden is

3   on the party bringing the action.  In this case, I think the

4   first thing you ask is, is the only issue being raised that

5   DCPS has failed to convene the meeting.  And I would say as of

6   the date of the complaint, because that's the only issue that

7   could be before the hearing officer.  And counsel said yes, so

8   it was some subsequent dialogue, but the only reality is the

9   burden is then on Mr. Turker and the parent to show that, the

10  failure to review this FBA has resulted in educational harm to

11  the student.  That's, that's the, that's the very short,

12  that's the short of it.

13      Subsequent action, what mean, subsequent activity was

14  brought in but since we don't have those records in the,

15  before the hearing officer, my understanding is that it was

16  the meeting went forward.  Now, so I don't know what

17  discussion took place.

18      HEARING OFFICER:  Uh-mm.

19      MS. LINDSAY:  My understanding was the FBA was reviewed

20  if there were other determinations made, based on the

21  substance of it.  That's not what before this hearing officer.

22  So, and there is a request for reviewing a FBA, which has been

23  done, and a determination of Comp Ed.  Reed lays out if you

11                                                          68

1    want Comp Ed you have to show why you are, why you believe

2    that the student is entitled to Comp Ed.

3         The student is attending a full time, Special Ed, a full

4    time day program, Special Education program.  Which on several

5    occasions, has become before maybe this hearing officer.

6    Several hearing officer say that they can go in, they can

7    review evaluations and make whatever adjustments, or that

8    review IEP's, update IEP's to the extend that they don't over,

9    well they can't make the Comp Ed determinations, that's the

10   DCPS, that requires the LEA, but they can.

11        And Ms. Plowden has stated on the record that she has an

12   understanding in agreement with Ms. Wall, whose is the

13   placement specialist monitor, that she can go forward with IEP

14   meetings.  The only thing that she can't do is add services.

15   So if they're reviewing an IEP and the services don't change,

16   they move forward.

17        So, unless there is an underlying claim that Rock Creek

18   is inappropriate, the only way there could be a denial of fate

19   is if the student is not receiving educational injury.

20        That means, - - excuse me, if the student has been

21   injured, based on this.  And Rock Creek will come in and tell

22   you on any other time that they'll service the student based

23   on this individual needs, period, whether the IEP says it or

24   not.

1      HEARING OFFICER:  Alright so, Mr. Turker let me ask you

2   this question - Is it your position of posture, with regard to

3   this matter or that, this student has been denied some

4   education benefit?

5      MR. TURKER:  Yeah, absolutely.  I mean the post - - This

6   is not a new argument, this is an argument from DCPS that

7   started with the burden of proof shift that they've been doing

8   this for years; coming in and saying, yeah we know we can do

9   what we were supposed to do.  I mean there is no disagreement

10  here that they were supposed to review the FBA.  So they say,

11  we didn't do what we're supposed to do but prove to us that

12  there was something that happened as a result - -

13     HEARING OFFICER:  Well let me ask you a question on that.

14     MR. TURKER:  But that's circular.

15     HEARING OFFICER:  Let me ask you a question on that that.

16     Every fact pattern has in it another twist of nuance,

17  nothing is ever the same, do you agree?

18     MR. TURKER:  Sure, as a philosophical matter, sure.

19     HEARING OFFICER:  Okay.  In this situation there is a

20  little bit of a nuance here, the nuance is this student is in

21  a private placement.  I don't know what, what does the IEP

22  require, do you know?

23     MR. TURKER:  Let me check on - -

13

70

1         HEARING OFFICER:  How many specializes in hours of

2    instructions, related services, - -

3         MR. TURKER:  For full service?  The full time IEP, yes.

4         HEARING OFFICER:  So at a minimum, we've got 27.5 hours

5    of specialized instructions.  What related services are

6    performed?

7         Counsel?

8         MR. TURKER:  Of what, sir.

9         HEARING OFFICER:  An hour and a half, psychological

10   counseling.

11        MS. LINDSAY:  In, in O.T.

12        HEARING OFFICER:  In O.T.  Or have you determined, Mr.

13   Turker in your representation of the student that those

14   services have if fact been provided by this private placement?

15        MR. TURKER:  As far as I know, yes.

16        HEARING OFFICER:  Okay.  So the student's IEP has been

17   implemented.  He's getting his school amounts of specialized

18   instructions, related services, and counseling services?

19        MR. TURKER:  Yes, his hours have been met.

20        HEARING OFFICER:  Okay, alright, now, Did you notify the

21   private placement that there was concern with the failure to

22   review the FBA?  I mean did you send a letter to them?

23        MR. TURKER:  Prior to the complaint?

14

71

1      HEARING OFFICER:  Or at any time?  I mean, because quite

2  frankly, what we're focused on is the fact that there is an

3  FBA that's outstanding.  As I read the complaint, it seems

4  that it's been performed in 2006.  Correct?

5      MR. TURKER:  Way back, yes, October 2006.

6      HEARING OFFICER:  So this is April 2007.  How many months

7  is that?

8      MR. TURKER:  Ah, six.

9      HEARING OFFICER:  Okay.

10      MR. TURKER:  Before the complaint, four.

11      HEARING OFFICER:  Okay.  Did any of that period of time

12  did you provide a letter to Rock Creek, the private placement,

13  requesting that they move forward with a review of this FBA?

14      MR. TURKER:  It's a little hard for me to answer.  I'm

15  not entirely sure whether that exact communication occurred.

16  I know that there was a communication with Rock Creek, and

17  there has in fact been a meeting with Rock Creek.

18      HEARING OFFICER:  Alright.

19      MR. TURKER:  So, I can't tell exactly, who communicated

20  with whom.  Likely, so in all candidness for the hearing

21  officer.  Likely what happened is, the complaint went out,

22  DCPS contacted Rock Creek, Rock Creek contacted us, we set up

23  a meeting with them, we had the meeting.  That is the common

24  the way it goes.

1      HEARING OFFICER:  And in that meeting you determined that

2  the FBA had not been reviewed?

3      MR. TURKER:  At that meeting, DCPS and a team agreed,

4  again, this isn't part of my complaint, I mean, I - -

5      HEARING OFFICER:  You're talking about post-complaint?

6      MR. TURKER:  Yeah, this didn't even happen yesterday.  So

7  and I agree with the counsel that I think all of the complaint

8  should be cut short at the time of the filing of the

9  complaint.  The problem is that DCPS comes in and says, well

10  did this, that, and the other thing and it was since the

11  filing of the complaint, and then I get in trouble if I don't

12  tell the hearing officer about a meeting that just happened,

13  that's why I always present that stuff.

14      HEARING OFFICER:  Well one of the reasons that you have

15  the resolution is that it does give DCPS a second bit of the

16  apple.  If they can clean up their act, then you know - -

17      MR. TURKER:  Right.

18      HEARING OFFICER:  Quite frankly, it should be withdrawn.

19  But you're saying that, there was a meeting, there was a

20  determination the FBA had not been reviewed.  And my question

21  to you was, during the initial period of time between the

22  completion of the FBA and the time, and, today's date, had you

23  contacted the school and asked them, could they get that

24  evaluation reviewed?

16

1        MR. TURKER:  Yeah and, as I said, the best answer I can

2    give you is the one I gave.  I know we had communications with

3    them, I can't tell exactly how they were initiated.  And I

4    gave you my best guess as to how they work, but that's just -

5    -

6        HEARING OFFICER:  So, can you provide for me - -

7        MR TURKER:  - - general practice.

8        HEARING OFFICER:  - - evidence on how this student has

9    been educationally harmed as a result of the FBA not being

10   reviewed?

11       MR. TURKER:  Yeah.

12       HEARING OFFICER:  I mean wouldn't you have to - - you

13   can?

14       MR. TURKER:  I can argue that it is, per se, denial of

15   fate, according to the regulations, - -

16       HEARING OFFICER:  Okay, but let's just say - -

17       MR. TURKER:  So to deny a student access to a fate, and

18   we don't know, - - Here's the problem, this is why they define

19   fate that way in the regs.  And this is, and like I said, this

20   isn't a new argument from DCPS, we've heard this years and

21   years before the burden has shifted.  The DCPS would say,

22   they'd come and they'd say, we did everything wrong, but, they

23   can't show her that the child was harmed.  And usually, they

24   would be making that argument when the child was in a private

17

74

1    placement.  And that I understand what the hearing officer has

2    said about that being a wrinkle in this case, but that's

3    hardly unique to this case, right, I mean we do have those

4    cases where the children are in private placements and DCPS

5    fails to do evals or fails to hold meetings, et cetera.

6        And DCPS has long made that argument.  The problem is,

7    why you can't quite call it circular, it is eternal.  I mean,

8    DCPS can sit back and say, we're never gonna do evals; we're

9    never gonna develop IEP's.  And since those evals will be

10   never done, the parent will never be able to proof what would

11   have happened if the evals had been done.  I mean I could

12   never show what would have happened if DCPS won't do it.

13       HEARING OFFICER:  But that's not the situation in this

14   case.  Now I understand your argument is based upon your prior

15   experience, but in this case the IP is developed; is being

16   implemented; you've indicated the related services have been

17   performed, and that the IEP is appropriate.  So - -

18       MR. TURKER:  No, no, no, I didn't indicate that, I didn't

19   indicate the IEP is appropriate.

20       HEARING OFFICER:  Okay, so you - -

21       MR. TURKER:  And that's why I stopped there saying

22   yesterday, ours have been delivered.

1    HEARING OFFICER:  Alright, let's focus, let's focus on

2    the - - So you suggest that the IEP is inappropriate based

3    upon the failure of DCPS to review the most recent FBA.

4        MR. TURKER:  Right, the failure to modify the IEP.

5        HEARING OFFICER:  Now, how you provide me information,

6    and evidence to support that position because I just can't

7    take it on paper.  What you are asking me to do is in some

8    sense determine this a pro se violation.  I'm not there.

9    Okay, if I'm not there, that means I can't make that

10    determination.  I need from you some evidence that that FBA,

11    and the failure of the private placement and DCPS to implement

12    a review that FBA has resulted in this student being denied

13    some educa - - or being injured some way educationally.

14        MR. TURKER:  Sure.

15        HEARING OFFICER:  That's what I'm, I'm trying, so, here

16    we are and I'm just - - usually, I don't get into these kinds

17    of focused legal argument.  I am more on the, show me what's

18    the damage is from the student.  If I can see the damage I can

19    come up with the remedy.  If I can't see the damage, where is

20    the remedy?

21        MR. TURKER:  Okay.

22        HEARING OFFICER:  Now, I could say to you, that I could

23    order a FBA; that they convene a meeting and review it.  I can

24    give that kind of Reed.  But what I'm looking for is, if you

1    come to me and suggest that there has been a denial of fate,

2    isn't it appropriate for me to receive some mono-gain of

3    evidence supporting how this has been damaged.  Now does that

4    suggest that you provide someone who understands an FBA, and

5    in fact, can give to me information about what would be the

6    damage resulting from the failure for that FBA to be

7    implemented within the IEP.  I think so, do you agree?

8         MR. TURKER:  I can provide that very easily.

9         HEARING OFFICER:  You can do what?

10        MR. TURKER:  I can provide that very easily.  And I think

11   that would be a more appropriate kind of evidence.  Because I

12   think what the hearing officer is talking about there is,

13   evidence regarding the problems that arise, or the denials

14   that occur, as a result of a failure to do a certain kind of

15   evaluation, in general.

16        HEARING OFFICER:  How can you provide it to me?

17        MR. TURKER:  The problem is I can't do any specifically

18   if the evaluation hasn't been done.  I can provide one if I

19   know enough about it, I can - -

20        HEARING OFFICER:  No, no, how can you provide me with

21   that evidence.

22        MR. TURKER:  I've got it two different ways, I have

23   disclosure Number 5, is the original SEP, to have the FBA

24   developed.  Okay, so this is the team statement of why this

1    FBA has to be done.  And that statement is, MDT wants to make

2    sure that D■■■■ has the correct disability classification,

3    and to ensure he's receiving appropriate services, that's

4    disclosure Number 5.

5         And I'm not saying SEP that says they want him to have an

6    FBA.

7         Now we didn't have the FBA itself that was done here.

8         HEARING OFFICER:  What is that?

9         MR. TURKER:  That is our number 8.  If we go to page 2, -

10   -

11        HEARING OFFICER:  Okay I'm on two.

12        MR. TURKER:  And we have he axis diagnosis.  This is a -

13   - there's some nice parts about FBA, but in any case, axis 1

14   is ADHD, which he's already been diagnosed with.  Axis 1 also

15   has disruptive behavioral disorder.  Right, indicating that he

16   may be better classified, or additionally classified as an ED

17   student, which he is not currently classified as.

18        HEARING OFFICER:  Okay, so he - -

19        MR. TURKER:  So we have his original SEP that says we

20   needed to make his classification is correct to the FBA.

21        HEARING OFFICER:  Okay let me ask you a question, Mr.

22   Turker, slow down.

23        MR. TURKER:  Sure.

24        HEARING OFFICER:  You have - -

21

78

1      MR. TURKER:  I have more, I wanted to make sure I get to

2  - that's the only reason I'm hurrying but I'll certainly

3  follow your instructions.

4      HEARING OFFICER:  Alright, we're just trying.  Alright, I

5  understand and I see that axis 1 suggest, states, that he has

6  disruptive behavioral disorder, not otherwise specified.

7  Alright, that means, to me, that there is something going on

8  with him in the classroom, where he is disruptive.  Then, to

9  me, what I would provide is some testimony, at this point in

10  time, that that is still current.  I don't know if it is.  I

11  don't know if he is still disruptive in the classroom.

12      It would seem to me that you would have someone who could

13  provide some real time testimony, that he had been observed

14  and this conduct was still existing.  I don't have that.  I

15  don't know if you were going to provide that.

16      That's why I request some information with regard as to

17  Is the parent going to be available?  Has she been there to

18  observe what's going on with the student?  Have you sent

19  anyone out there to see, if in fact, this student is still

20  having this scenario.

21      If you had done that, or if you have, okay, I'd like to

22  hear that kind of testimony.

23      MR. TURKER:  I can present that, I had someone at the

24  school, yesterday, discussing that with the staff.

1       HEARING OFFICER:  What's your response?

2       MS. LINDSAY:  My response is, first of all, Mr. Turker

3    made a statement in passing that DCPS is in terminate, its FBA

4    is inappropriate, or incomplete or something like that.  This

5    Rock Creek developed his IEP, I mean excuse me, this FBA.

6       The school that providing services to the student.  So, I

7    - -

8       HEARING OFFICER:  Wait a minute.  Wait a minute, wait a

9    minute wait a minute.

10      MR. TURKER:  Who will develop the FBA?

11      MS. LINDSAY:  Rock Creek.  The placement, the school that

12   is providing D███████ his services, developed the FBA, in

13   October of '06.

14      HEARING OFFICER:  Well, that's interesting, because, if

15   the school developed the FBA, obviously they know what's going

16   on.  And why didn't they, in fact, adjust the IEP to reflect

17   this.

18      MR. TURKER:  Because it - - Okay, first of all, I wanna

19   address that point, because I have lost, I've lost the

20   hearing.  Not just I had, I've been in this argument before.

21   I have lost the hearing, going to the hearing officer saying,

22   - - in fact it was even an FBA, I can pull the decision with

23   Mr. Brook saying, DCPS has not done their evaluation, right?

1  And DCPS came in and said, Oh Rock Creek did the evaluation,

2  they did it yesterday.

3      So, DCPS tries to place it, play it both ways, either

4  this evaluation - -

5      HEARING OFFICER:  But what's your point?

6      MR. TURKER:  My point is, either this evaluation, done by

7  Rock Creek, counts as the evaluation to be considered, for the

8  student, or, DCPS has failed completely to do the evaluation.

9  But they want to play it both ways, they want to say, ``Oh we

10  want this evaluation to count, for purposes of our, an

11  evaluation having been done.  But we don't want his evaluation

12  to count for the purposes of the content of the evaluation.''

13      In other words, if they don't want to talk about what

14  this says - -

15      HEARING OFFICER:  I understand what you've just

16  enunciated is that on some previous occasions, DCPS has

17  indicated that, the evaluation that has been in question, has

18  been performed by the school of private placement.  And

19  therefore, they were not part of and therefore is, invalid, in

20  some sense of the word.

21      MR. TURKER:  No, no, no, the opposite.

22      HEARING OFFICER:  What, they - -

23      MR. TURKER:  They have, they'd made the argument that

24  they're - - the evaluation done by Rock Creek - - and I

24

81

1   consider it a perfectly good argument.  That an evaluation

2   done by Rock Creek, is done on DCPS's behalf, and therefore,

3   satisfies their obligation to do the evaluation.  Now, I have

4   no problem with that, really.  I mean when I walked, I didn't

5   appeal that HODS, I said, well yeah, it makes sense, right.

6   Rock Creek is providing the education to the child, DCPS tells

7   Rock Creek to do the evaluation and they do it.

8        HEARING OFFICER:  Rock Creek is in essence, an agent of

9   DCPS's.

10       MR. TURKER:  Yeah.

11       HEARING OFFFICER:  They get paid DCPS to provide

12  educational benefit, and so, they are part of the same team.

13       MR. TURKER:  Exactly, but here they are trying to be this

14  moving target, where, you know, in their response, it doesn't

15  say anything about how, ``Oh, well we don't consider this FBA

16  valid, we don't want to look at the content of this FBA

17  because Rock Creek did it.''

18       Just now, counsel wanted to correct me, saying, ``wait a

19  second, DCPS didn't determine that their evaluation was no

20  good, DCPS determined that Rock Creek's evaluation was no

21  good.''

22       MS. LINDSAY:  I didn't say that.  I just simply made the

23  clarification that Rock Creek performed the FBA, that's all I

24  said.

1    MR. TURKER:  What's the distinction, what's the

2  distinction of worth.  I mean it sounds to me like DCPS is

3  trying to divorce itself from the contents of this evaluation,

4  but - -

5    HEARING OFFICER:  Well, let's straighten that issue out

6  right now.  From my perspective, and this is my perspective as

7  a hearing officer, the validity of an evaluation is based upon

8  whether or not it is one that has been satisfied by the

9  criteria for an evaluations.  Specifically in these cases,

10  where there is a relationship which I consider to be an agency

11  in some sense, because DCPS pays this into these to provide

12  educational benefit to the student.  So therefore, if there is

13  an FBA, and it has been performed, unless someone comes in

14  that says, that document, that evaluation is invalid because

15  of A-B-C-D, the validity of it is not questioned.

16    So to me, when someone performs an FBA, unless I hear

17  some substantive challenge about the fact that the person who

18  performed was not qualified, the fact that it was done in

19  superstitious environment, da, da, da.  Or the student has

20  been tested so much that it was invalid.  Other than that, I'm

21  not really - - I wouldn't question it, unless those kinds of

22  issues are brought to my attention.  I haven't heard any of

23  that today.  All I've heard is that there was an FBA

24  performed.

26

83

1        Now, one of the issues that makes me concerned now, based

2    upon that representation, is that this school is an agent of

3    DCPS, DCPS an oversight, they have this relationship, they

4    performed the FBA.  Why didn't they incorporate it in the IEP?

5    I mean, it's a simple ceremony, and maybe I'm missing

6    something, because I haven't been at a private placement to

7    determine, how that - - what's the standard procedure.  But it

8    would seem to me, the standard operating procedure is that,

9    you perform an FBA, and you see there's some concerns that

10    that would automatically be digested into the IEP.  But you're

11    saying that didn't occur.

12        MR. TURKER:  That didn't occur, and yes, that's what one

13    would think, and that's what one would think about DCPS

14    schools in general, that it doesn't have a - -

15        HEARING OFFICER:  I'm not talking about DCPS school, I'm

16    talking about a private placement, which is to me, in some

17    sense of the word, a superior scenario, because, these are

18    individuals who are paid a awesome amount of money to provide

19    educational benefit.

20        MR. TURKER:  Well, I can speak generally about - - can I

21    get that door, I assume.

22        HEARING OFFICER:  Certainly.

23        MS. LINDSAY: [Microphone not picking up what was being

24    said, talking too quite.]

27

84

1        MR. TURKER:  This, need a minute?

2        MS. LINDSAY:  Okay, thank you, no.

3        MS. LINDSAY:  Okay, thank you.

4        HEARING OFFICER:  Would counsel for the representative

5   like a few minutes?

6        MS. LINDSAY:  No, my son is sick, so I have to - -

7        HEARING OFFICER:  Oh okay.

8        MS. LINDSAY: - - keep my phones working.

9        MR. TURKER:  Oh you're right.

10       HEARING OFFICER:  Alright.

11       MR. TURKER:  Umm, I can - -

12       HEARING OFFICER:  Wait a minute, let me just say this,

13   now.

14       MR. TURKER:  Sure.

15       HEARING OFFICER:  Okay.

16       [Pause.]

17       HEARING OFFICER:  I understand your position.  I

18   understand what your argument is.  I understand your position.

19   What evidence do you have to support your position, because I

20   am not going to give a summary judgment on this, or a summary

21   adjudication, in other words, I need some evidence from you.

22   Specifically, I need some evidence with regard to what is the

23   educational injury that has been suffered as a result of the

24   FBA.

28

85

1      Now, you just pointed to me, that there was some

2  excellent conduct that suggested he has disruptive behavior in

3  class, show me that that is still occurring.  Then, I can

4  definitely link that to the fact that the FBA has not been

5  incorporated into the IEP.  And to me that would be some

6  Rembrandts of some education damage.

7      But I am so concerned about the fact that, here is a

8  private placement, and I'm concerned about - - from my

9  perspective, you know, if you had prepared a letter to them,

10  requesting, and I don't know you don't have to do any of this,

11  - - but in meeting your burden, I would have loved to have had

12  a letter to the school saying, ``we request that you revise

13  the IEP as a result of the new FBA that has been performed on

14  October, 2006.''

15      To me, that puts you in a clean hands position.  And I'm

16  not saying you don't have clean hands, I'm just saying, that

17  that would put the oneness on what's the explanation as to why

18  this wasn't incorporated.  Especially, when the school itself

19  performed the evaluation, and they didn't do it, I mean, did

20  DCPS tell them not to do it?

21      MR. TURKER:  I have no idea, but I think that's kind of a

22  key point here, right?  I mean, it's their own evaluation,

23  it's hard to understand why there would be - - and they're the

1   ones who sent the evaluations to us.  We didn't - - that's how

2   we got it.  So why they scheduled a meeting I don't know.

3        HEARING OFFICER:  MS. - -

4        MS. LINDSAY:  I think we are moving off point - -

5        HEARING OFFICER:  Okay.

6        MS. LINDSAY: - - in this case.  The bottom line is, I

7   think we all have civil practice outside of this and that we

8   all know that for every wrong there is not always a remedy.

9   This is not a strict construction statute it's notice statute

10  for the parent.  So, the fact that, there is some - - this is

11  an imperfect system because it's made of people.  In caseloads

12  in support of it every time there's not - - you're not gonna

13  find a perfect scenario.

14       So where there may be some error, unless you - - there

15  has to be a showing that it's educational injury or there is

16  no remedy, that's the reality, there is no remedy.

17       This case was simply that DCPS did not review the IEP,

18  this, the FBA, as of the filing of this complaint.  That's the

19  sole issue in this case.  And the request is that a meeting be

20  held, to review the FBA, which counsel acknowledged the

21  meeting took place yesterday, and there was some other reme -

22  - other things that occurred, out of that.

23       We don't - - none of - - we all have - - that's not

24  before this hearing officer, it's just, um - -

1        HEARING OFFICER:  Well don't mention it.

2        MS. LINDSAY: - - practice.

3        HEARING OFFICER:  Don't give me - -

4        MS. LINDSAY:  Okay, I'm assuming he's saying is what was

5    requested, - -

6        HEARING OFFICER:  Alright I understand what you're - -

7        MS. LINDSAY: - - has been done.  But maybe there were

8    other things that stand out of it.  And then, that there was

9    Comp Ed that a Comp Ed award be made.  So that requires, not

10   argument, but evidence.

11       HEARING OFFICER:  Right.

12       MS. LINDSAY:  All I brought to hearing officer's

13   attention in - - I'm not saying anything new, counsel just

14   made a statement on the record, which I just want clarified.

15   Because in his complaint, it says, R.C.H., Rock Creek

16   completed the FBA.

17       So that's all, I was just making a - - I wasn't trying to

18   play games or moving targets, whatever.  The student has been

19   in Rock Creek for two years now.  In counsel's opening or his

20   statement, it says that Rock Creek has behavioral component.

21   So, what I'm saying is that, okay, that the FBA hadn't, wasn't

22   reviewed, yes, as of, and then there is no dispute as of the

23   filing of this complaint it wasn't reviewed.

31

88

1      Okay, that is not a straight, that doesn't mean we go

2  straight to relief now.  You have to show that there is some

3  impact.  That's the reality, that's the statute.  You have to

4  show there's impact.  And I don't have a clinical background,

5  but I've read enough at least to know the DSM-4 is not

6  necessary for educational programming.  But that's my being

7  here five years.

8      HEARING OFFICER:  That's your understanding?

9      MS. LINDSAY:  That's my understanding.  So reading from

10  the DSM-4 means nothing.  So then we have the question is,

11  that there is no - - then we start saying the FBA is not

12  appropriate.  That's not part of the complaint, if the FBA

13  was, if there was some question of the FBA.

14      HEARING OFFICER:  That was like the side part, we're

15  really getting into a lot of the things that are outside the

16  scope, but - -

17      MS. LINDSAY:  Right.

18      HEARING OFFICER:  I think to me it provides some

19  clarification, because of course these things are gonna happen

20  again, so if we get this straighten them out, then, Mr. Turker

21  comes unprepared if, I mean, I'm still looking, when I say

22  let's hear it - -

23      MR. TURKER:  I have that testimony the hearing officer

24  wants.

1          HEARING OFFICER:  Okay, who is it?

2          MR. TURKER:  It's Ms. Miller's.  I have a few more points

3     I'd like to make, though.  I can make them later, if the

4     hearing officer would prefer.

5          HEARING OFFICER:  Okay.

6          MR. TURKER:  But based on the arguments I've heard here,

7     there are a few more points I'd like to make.

8          The first is that, and I know we don't want to go too far

9     into what has occurred since the complaint.  And again, I'd

10    present that primarily, in candor to the hearing officer,

11    because another hearing officer jumps down my throat if I

12    don't talk about what has happened since the complaint.  In

13    any case, - -

14        [Laughter.]

15        MR. TURKER:  So it's yeah it, you know we're out here

16    trying to figure out what the different officers want.  But

17    while the meeting occurred, the relief that we requested in

18    our complaint has not been completed.

19        Now, one reason to talk about what has happened since the

20    complaint is because it does serve as evidence of the harm

21    that occurred from not reviewing the FBA sooner.

22        One part of the harm that occurred, is that had they

23    reviewed the FBA in a timely fashion, they would have made the

24    determination they had made yesterday, which was that they

33

90

1    needed the FBA redone, and they needed these other evals done.

2    They would have made that determination earlier, because

3    that's the determination they made yesterday.  And so that's

4    part of the harm.

5         HEARING OFFICER:  So why didn't they contact them?

6         MR. TURKER:  What?

7         HEARING OFFICER:  Why didn't you contact them?

8         MR. TURKER:  At the time the FBA was - - because they

9    already knew the FBA existed.  And I don't have an answer to

10    that question.  And because I'll tell you from the experience

11    of - - I can tell you my experience and the experience of

12    other attorneys I've known practicing in this area.

13         HEARING OFFICER:  Alright.

14         MR. TURKER:  And, I've seen plenty of it from two other

15    attorneys besides me, which is that, you can send letter,

16    after letter, after letter, to DCPS, and you get zippy and no

17    response.  I mean that's what happens.

18         So we don't waste our time and our parent's time, because

19    every one of those letters means, okay, I send a letter.  I've

20    got to wait some reasonable time for them to respond, so I

21    wait a week.  And there's no response, and again, I send

22    another letter, and different hearing officers put all kinds

23    of obligations on us in their HOD's.

24         HEARING OFFICER:  Right.

1      MR. TURKER:  Mr. Banks in particular.  He's got, you

2  know, four different steps we have to follow, and we follow

3  them all.  It never makes a difference.  I still end up in the

4  exact same complaint, and it just takes place two weeks later

5  than when I looked at it.

6      HEARING OFFICER:  Well for me, I mean I would - - your

7  case would be a lot stronger if you had a letter to Rock Creek

8  Academy, requesting that they convene a meeting, and just cc

9  DCPS.  Now, that helps me.

10      MR. TURKER:  That helps me.

11      HEARING OFFICER:  So remember that in the future.  So,

12  having said that, what witnesses do you intend to call to

13  determine what amounts of educational injury has occurred.

14      MR. TURKER:  Okay, and, alright, I'm gonna call Ms.

15  Millis, but I want to be clear in what I'm presenting, and

16  I'll do it as a propher.  I think the hearing officer will

17  want to hear her from whatever the hearing officer say, but -

18  -

19      HEARING OFFICER:  I don't need you to propher, just tell

20  me - -

21      MR. TURKER:  Alright.

22      MS. LINDSAY:  May I, I just want to - - if her testimony

23  is not subject to this complaint, anything that's posted, I'm

24  gonna object to.

35

92

1      MR. TURKER:  I agree.

2      MS. LINDSAY:  Because I don't have - - I have no - -

3      MR. TURKER:  I agree.

4      MS. LINDSAY: - - I have no nothing to object to compare

5    it - -

6      MR. TURKER:  I agree, we're not - -

7      MS. LINDSAY:  What her impressions are what happened

8    yesterday, are relevant to what happened between October '06

9    and February 15th.

10      MR. TURKER:  My understanding from the hearing officer

11    just a minute ago, was that, the hearing officer wanted to

12    hear whether there was still a behavioral issue with D█████

13    right now in the class.  So that is a question about a current

14    reality about D██████.

15      HEARING OFFICER:  Whether she's observed that, I mean

16    that's - -

17      MR. TURKER:  Well she's discussed this with his - -

18      HEARING OFFICER:  No the scope - - has she observed this

19    with him, in behavioral problems at the school, in the last -

20    - has she gone to the school to observe him, quite frankly.

21      MR. TURKER:  Does that mean was there an observation of

22    his class?  I don't believe so, I maybe wrong.  I don't

23    believe so.

24      HEARING OFFICER:  Well how will she know, then?

1          MR. TURKER:  Because she's discussed him with the people

2    giving services to him.

3          HEARING OFFICER:  Okay.

4          MR. TURKER:  I don't understand why that's suddenly

5    invalid, I mean, that mean is there - - again, DCPS isn't.

6          HEARING OFFICER:  So she has had, held discussion, well

7    you put the evidence on her.

8          MR. TURKER:  Well, yesterday, she had discussion

9    yesterday.

10          HEARING OFFICER:  Alright.

11          MR. TURKER:  Okay.

12          MS. LINDSAY:  While he's getting Ms. Millis on the phone,

13    may I step out?

14          MR. TURKER:  You want to go off the record?

15

16          [Off the record from 9:49 a.m. to 9:52 a.m.]

17

18          HEARING OFFICER:  Alright we're back on the record.

19    We've had several dialogues with regard to this matter and,

20    we're at the point now where Mr. Turker gonna call a witness

21    to find what he considers it to be educational injury involved

22    in the matter.

23          Alright Mr. Turker who are you gonna call?

24          MR. TURKER:  Sharon Millis.

37

1        HEARING OFFICER:  Alright.

2        MR. TURKER:  Let me sign her name.

3        [Ms. Lois was contacted by phone.]

4        [Pause.]

5        MR. TURKER:  Alright, Sharon, you're still there?

6        Mr. TURKER:  Okay you're on the speakerphone in the room

7    with me, we're on the record now.  In the room with me are Mr.

8    Jones, the hearing officer, and Gwen Harris Lindsay, special

9    counsel.

10        HEARING OFFICER:  Alright Ms. Millis?

11        MS. MILLIS:  Sir.

12        HEARING OFFICER:  How are you?

13        MS. MILLIS:  I'm well sir, how are you?

14        HEARING OFFICER:  I'm fine, I'm going to swear you in to

15    render testimony in the matter of D██████ B█████.

16        MS. MILLIS:  Okay.

17        HEARING OFFICER:  Will you raise your right hand?

18        MS. MILLIS:  Yes sir.

19        HEARING OFFICER:  Do you swear to tell the truth, the

20    whole truth and nothing but the truth so help you God?

21        MS. MILLIS:  I do sir.

22        HEARING OFFICER:  Please state for the record your full

23    name and your occupation.

24

1                    **TESTIMONY OF SHARON MILLIS**

2

3        MS. MILLIS:  My name is Sharon Millis, and I am an

4    independent special education advocate, and expert.

5        HEARING OFFICER:  Alright, go forward with her

6    examination.

7        MR. TURKER:  Ms. Millis, when was the last - - are you

8    familiar with D█████ B█████, first off?

9        MS. MILLIS:  Yes, I am.

10       MR. TURKER:  Is he a client of yours?

11       MS. MILLIS:  Yes he is, he has been a client, a client

12   for approximately, let's see, a little over two years now.

13       MR. TURKER:  When was the last time you attended a

14   meeting regarding D█████?

15       MS. MILLIS:  Yesterday.

16       MR. TURKER:  And, where was that?

17       MS. MILLIS:  That was at Rock Creek Academy.

18       MR. TURKER:  Was there any discussion of D█████ current

19   behavioral situation?

20       MS. MILLIS:  Yes, there was.

21       MR. TURKER:  Is D█████ behavior currently an issue in

22   class?

23       MS. MILLIS:  Yes there is, there is a concern about

24   D█████ behavior in class.

                              39                              96

1      MR. TURKER:  And where do you get that information from?

2      MR. TURKER:  Well first I want to ask you have you

3  observed him directly, recently?

4      MS. MILLIS:  I have not observed him in the classroom

5  sitting directly.  I've spoken with teachers, I've spoken with

6  related service providers, I've spoken with the IEP

7  coordinator.  When we have had our meeting, an FBA was

8  determined to be needed, and that's an indication that there

9  is a behavioral concern, so yes, behavioral, and behavior has

10  been a ongoing problem with D████.  In the two years that he

11  has been a client of mine, behavior has been a problem.  So,

12  it continues to be a concern.

13      MR. TURKER:  Alright, what is your current occupation?

14      MS. MILLIS:  I am currently an independent special

15  education advocate, and expert

16      MR. TURKER:  And can you tell us a little about what that

17  means?  What do you do?

18      MS. MILLIS:  Well, I do a little bit of everything.  I

19  observe children in classroom, I review files to determine

20  whether or not children has the appropriate evaluation;

21  whether they've been place in the appropriate setting, whether

22  they're getting the appropriate services.  I guess it just

23  encompasses almost everything regarding a child's

24  disabilities.

97

1      And then, if they don't, I'd go out to trying to obtain

2  those services and the placement towards - -

3      MR. TURKER:  Do you participate in IEP meetings as a part

4  of that?

5      MS. MILLIS:  Yes, I do.

6      MR. TURKER:  And do you review FBA's as a part of that.

7      MS. MILLIS:  Yes, I do.

8      MR. TURKER:  And how long have you been doing that? - -

9      MS. MILLIS:  Well - -

10     MR. TURKER: - - privately?

11     MS. MILLIS:  Well, participating in IEP meetings and

12  reviewing FBA's and actually writing FBA's - -

13     MR. TURKER:  No-no, wait-wait a minute, stop there, I

14  mean how long have you been working as a an independent

15  advocate and expert?

16     MS. MILLIS:  Oh, nine years.

17     MR. TURKER:  And before that, what did you do?

18     MS. MILLIS:  I worked for 26 years for the D.C. schools.

19  For approximately 11 of those years I was in a classroom

20  setting.  For about 12 twelve years after that, I was in a

21  client setting, and for approximately a year after that, I was

22  a principal, acting principal of an ED setting.

23     MR. TURKER:  And in your capacity working in compliance

24  for DCPS, did you participate in IEP meetings?

1          MS. MILLIS:  Yes, I did.

2          MR. TURKER:  Did you review files for conclusion of an

3    evaluations?

4          MS. MILLIS:  Many, many files.

5          MR. TURKER:  Did you train people in doing those

6    activities?

7          MS. MILLIS:  Yes, I trained.  Actually our job, part of

8    our job is to train monitors, we're to train all of the, all

9    the teachers, all the related service providers on how to

10   write IEP's, how to come into compliance with federal, state

11   and municipal guidelines, and how to provide what was required

12   by law. - -

13         MR. TURKER:  Okay.

14         MS. MILLIS:  - - and on the IEP.

15         MR. TURKER:  And were FBA's a part of the process back

16   then?

17         MS. MILLIS:  Yes, they were.

18         MR. TURKER:  Have you ever performed an FBA yourself?

19         MS. MILLIS:  Yes, I have.

20         MR. TURKER:  More than one?

21         MS. MILLIS:  Yes, I have.

22         MR. TURKER:  For how long have you been doing that?

23         MS. MILLIS:  I guess he's done an FBA, wow.  I've been

24   doing FBA's I guess for about 30 years.

42                                                          99

1       MR. TURKER:  Since it's only for a very narrow purpose in

2  this testimony, I - - oh excuse me, have you ever testified as

3  an expert before?

4       MS. MILLIS:  Yes, I have.

5       MR. TURKER:  Have you been admitted as an expert at

6  administrative hearings here at the student hearing office?

7       MS. MILLIS:  Yes, I have been.

8       MR. TURKER:  What about the federal district court, the

9  District of Columbia?

10      MS. MILLIS:  Yes, I have been there too, and the Superior

11  court, and Circuit court in the State of Maryland.

12      MR. TURKER:  Okay.  To offer Ms. Millis for expert

13  testimony regarding the use and the function of an FBA in the

14  child's programming?

15      MS. LINDSAY:  No, I don't, I don't object.

16      MR. TURKER:  I'm not sure if we could find somebody who

17  is be more of an expert, anywhere, in the development of FBA

18  than Ms. Millis.

19      HEARING OFFICER:  Why don't you do some more void-hear on

20  getting her to explain exactly what an FBA is and how its - -

21      Point it toward here a little bit more.

22      MR. TURKER:  Sure.  Ms. Millis, can you describe, let's

23  start out from the general description of an FBA and then

1    perhaps we'll ask you some questions about some of the

2    details.

3        MS. MILLIS:  Sure.  All behavior has reason, um - -

4        MS. LINDSAY:  Sorry, my other question is, based on is -

5    -

6        MR. TURKER:  I'm sorry Ms. Millis there is an objection I

7    think.

8        MS. LINDSAY:  Is there a foundation of her providing - -

9    now I don't - - the fact witness is fine, but expert means

10   there has to be some clinical and discreet training in

11   clinical experience in the area.  I do not doubt that Ms.

12   Millis has educational experience, but the experience in of

13   itself, doesn't make her an expert.  And if we're speaking of

14   an expert it is in a discreet area not just general.  So, an

15   expert in what?

16       And I haven't heard anything other than I've done FBA's

17   for 30 years, it means - -

18       HEARING OFFICER:  Yeah, ask her that's a lot of training

19   here, and you know you can void-hear her.

20       MS. LINDSAY:  If, but it's, we don't need - -

21       HEARING OFFICER:  I understand.

22       MS. LINDSAY:  If its going to be testimony then, she - -

23   lea-way as a fact witness, but expert testimony I'm not going

24   to - - and Ms. Mosley come down here as a expert from

                              44

1    everything from, in general special education, and IEP

2    development to ED, and it can't be everything, it has to be -

3    you're not an expert in everything, it's not possible.

4         So is she in clinical, and in clinical, is it an ED,

5    what?  I mean so - -

6         HEARING OFFICER:  Do you want to void-hear her?

7         MS. LINDSAY:  If you're going to, if you are going to

8    allow her - -

9         HEARING OFFICER:  No, no, no, wait a minute.

10        MS. LINDSAY:  I would like a chance to void-hear her but

11   I don't even know exactly what we're talking about, it was a

12   psy- -

13        HEARING OFFICER:  What we're talking about - -

14        MS. LINDSAY:  If it's an FBA, I needed some background

15   I'm not hearing it enough.  And I don't have her resume in

16   front of me.  The resume I have, I've heard Ms. Millis said

17   it's not representative of all she does, which means I don't

18   have proper foundation to properly void-hear her, because I'm

19   taking her at her word, and what I'm hearing for evidence is

20   not consistent with the resume I've seen.

21        So, we're, Ms. Millis - - we're all over the place with

22   Ms. Millis' expert status.  That's all, I don't doubt that she

23   has experience.  But I don't believe it's expert status.

1        MR. TURKER:  But it's about - - I want to be perfectly

2    clear, I've heard this particular attorney said before that

3    the testimony that Ms. Millis has given does not deal with the

4    resume.  I've taken this exact testimony from Ms. Millis, I

5    don't know, a hundred times maybe, it's always the exact same

6    thing, the hearing officer has probably heard it 20 times.

7        HEARING OFFICER:  Well, okay.

8        MR. TURKER:  And so, I don't what the statement is, it

9    doesn't deal with the resume.  I've seen the resume, I've

10   heard testimony, I just don't appreciate that with intention.

11       HEARING OFFICER:  Well here is what I'm interested in.

12   It's just void-hear Ms. Millis on whether or not she has had

13   specialized training, any clinical training, just get that out

14   in the record, and then I'll make that determination.  Simple.

15   And I'll allow you to void-hear.

16       MS. LINDSAY:  That's fine.

17       HEARING OFFICER:  Okay, so, Ms. Millis?

18       MS. MILLIS:  Yes.

19       HEARING OFFICER:  Okay.

20       MS. MILLIS.  Yes sir.

21       HEARING OFFICER:  Just answer the questions as best you

22   can.

23       MR. TURKER:  Ms. Millis, are you aware of any academic

24   training program for performing FBA's?

103

1        MS. MILLIS:  There actually is a part of - - when my

2   degree is in Special Education of the Seriously Emotionally

3   Disturbed.  And as a part of that program, you do have

4   training in being able to write, and interpret a functional

5   behavioral assessment.

6        There are programs that come out all the time regarding

7   functional behavioral assessment, but those are programs that

8   come from different company.  And so, that's, you know, and

9   you get training from those particular company.  But there are

10  no classes, there's no degree, there is nothing like that.

11       When I was part of the compliance monitoring unit, I was

12  trained by those psychiatrist, and psychologist, and social

13  worker in being able to read the different evaluations,

14  because we had to be able to interpret, and we had to be able

15  to make determinations about those evaluations as to their

16  adequacy and their appropriateness, regarding students.  And

17  we also were trained to be able to make determinations about

18  functional behavioral assessments.

19        So, I mean DCPS actually did a lot of the training, or

20  the individuals in DCPS did the training.  And determines us

21  to be expert because they sent us out to review every single

22  child, who is a resident of the District of Columbia.  So,

23  that training was ongoing for 11 years, and that's the kind of

24  training we had.

104

1      We had to make determinations about whether those

2   evaluations were adequate.  And when you look at an FBA, there

3   are certain things that you have to be able to decide when you

4   see that document in order to program for the child.  So, it's

5   just a matter of basically using common sense as well.

6      MR. TURKER:  I think - -

7      HEARING OFFICER:  Do you want to - -

8      MR. TURKER:  As far as her training that was it.

9      HEARING OFFICER:  Alright.

10      Ms. Lindsay:  Do you want to void-hear?

11      MS. LINDSAY:  Yes.

12      Ms. Millis?

13      MS. MILLIS:  Yes.

14      MS. LINDSAY:  Just a couple of questions.  When was the

15   last FBA you performed?

16      MS. MILLIS:  The last FBA I performed, - - that I

17   personally performed?

18      MS. LINDSAY:  Yes.

19      MS. MILLIS:  Was approximately two years ago.

20      MS. LINDSAY:  And, was that on a one of your clients?

21      MS. MILLIS:  It was on a client for another attorney.  I

22   believe it was for Christopher Anlutz, one of Christopher

23   Anlutz's client.

1      MS. LINDSAY:  Okay.  And your - - if I'm correct and I

2  don't have your resume before me, your last training or degree

3  in your area of specialty was in 1972?

4      MS. MILLIS:  No, that was, no, that was the last - - That

5  was when I got my Master's.  I've been working on my PhD, I

6  have not done my dissertation, and I have been - - I'm still

7  certified, so I have been doing ongoing courses, - -

8      MS. LINDSAY:  I'm sorry, you're certified - -

9      MS. MILLIS: - - for the last 35 years, - -

10     MS. LINDSAY:  Hold on, hold on, hold on Ms. Millis.  Ms.

11  Millis hold on.  Don't do, this is cross, so you hold that - -

12     MS. MILLIS:  Okay, so - -

13     MS. LINDSAY:  I just need you to answer my question.

14     MS. MILLIS:  Alright.

15     MS. LINDSAY:  You said you - - Where are you certified?

16     MS. MILLIS:  In D.C. and in Maryland.

17     MS. LINDSAY:  D.C. and Maryland.  Okay, so the

18  certification office in this building has your certification?

19     MS. MILLIS:  Yes they do.

20     MS. LINDSAY:  Okay.  And you say you are currently

21  working on your Ph.D.?

22     MS. MILLIS:  I haven't done my dissertation, and I

23  probably won't do my dissertation.  So - -

49

106

1       MS. LINDSAY:  No, my question is, are you currently

2   working?

3       MS. MILLIS:  No, I think I've gotten all the class

4   working, I'm not gonna do my dissertation, so I think I'm

5   finished.

6       MS. LINDSAY:  And when did you stop working on your

7   Ph.D.?

8       MS. MILLIS:  I think I probably decided to stop this

9   year.

10      MS. LINDSAY:  Isn't it true, I think we had this dialogue

11  before?  That you, that - -

12      MS. MILLIS:  Yeah, I think this year I'm just, I'm really

13  if not going in the direction that I'm going.

14      MS. LINDSAY:  Okay.

15      MS. MILLIS:  It was in supervision and administration and

16  that's not what I'm doing currently, so, I'm not doing my

17  dissertation.

18      MS. LINDSAY:  Okay.  And your work over the last nine

19  years has been, as an advocate for parents who have students

20  within the District of Columbia system or maybe outside, in

21  other jurisdiction as an educational advocate?

22      MS. MILLIS:  And expert, that's correct.

23      MS. LINDSAY:  Your specific training though is in the ED

24  classification of students?

1        MS. MILLIS:  That's what my degree is in.

2        MS. LINDSAY:  Okay.

3        [Pause.]

4        MS. LINDSAY:  I have nothing further.

5        HEARING OFFICER:  Alright I'll defer my determination on

6   that issue, let's go forward.

7        MR. TURKER:  Okay, umm - - Ms. Millis can you - -

8        MS. MILLIS:  You've lost your train of thought.

9        [Laughter.]

10       MR. TURKER:  Yes.

11       MS. Millis, can you tell us what the purpose of an FBA is

12   as far as an impact on the child's educational program?

13       MS. MILLIS:  Right.  All behavior has a function; it has

14   a meaning.  And, children, usually children who are emotional

15   disturbed, or who are other help impaired, has behavioral

16   disorders, display behavioral disorders.  And, so in order to

17   make determinations about programming about how best to serve

18   the child, it's important to decide exactly how these, what

19   happens when these behaviors occur.  What triggers these

20   behaviors; what happens when the behaviors occur; what happens

21   after the behaviors occur; are there any, is there any

22   consistencies to the behaviors; do the behaviors happen more

23   at one time or another time.

108

1        So data needs to be gathered, baseline information needs

2    to be gathered, and it needs to be analyzed and it needs to be

3    looked at.  And teachers can make a determination as to what

4    happened and how best to deal with this particular child.  So,

5    that's why they have a functional behavioral assessment.  All

6    behavior has a function, so in order to determine what the

7    function of the behavior is, what does the child use the

8    behavior for; does he use it for revenge; does he use it for

9    self-esteem; does he use it to be able to get out of doing any

10   work.  I mean, that's exactly what a functional behavioral

11   assessment does.

12       And so, there are many different ways in order to gather

13   this data.  There are direct assessments, there are indirect

14   assessments, and usually, the appropriate way to do a

15   functional behavioral assessment is to do a combination of

16   both.

17       MR. TURKER:  Okay, let me stop you here, because I want

18   to redirect you to the final ends of an FBA.  Now once an FBA

19   has been done, can you use it to change the educational

20   program for that child?

21       MS. LINDSAY:  Absolutely.

22       MR. TURKER:  And is that change executed in the IEP and

23   some other context in both?

24       MS. LINDSAY:  It's usually its part of - -

109

1    MR. TURKER:  What, subject to an objection, is it?

2    MS. LINDSAY:  Right, usually it's part of the IEP.  A lot

3    of times it may be a part of the therapeutic component.  It

4    may be through the social emotional goals; it may be through -

5    - it depends on what the therapeutic model is that the school

6    is using; it may change the therapeutic model that the child

7    is using; it may change the goals and objectives.  It all

8    depends on what the results of the FBA is.

9    MR. TURKER:  Now in this case, in D████ B███████ case,

10   you're aware of an FBA performed in October '06?

11   MS. MILLIS:  Yeah.

12   MR. TURKER:  And that FBA has - - Was that FBA used to

13   change his programming yet?

14   MS. MILLIS:  No.

15   MR. TURKER:  Okay.  Can you give me some examples, not

16   necessarily in D████████ case, but can you just give me some

17   examples of elements that may be added to a child's IEP or to

18   a behavioral intervention plan, as a result of an FBA in your

19   experience?

20   MS. MILLIS:  There may be a level system that's already

21   in place for a child.  But a child may need specific re-

22   enforcer; or a child may need certain time-out; or a child may

23   need to be able to do his own re-enforcing.  Or he may need a

24   different model entirely.  It may be a behavioral cognitive

53                                                    110

1    model that they're working on, which is sort of a talk therapy

2    model.  And that model may not work for this particular child

3    because he may not necessarily be a verbal child, and that

4    kind of re-enforcement may not work for him.  He may need some

5    things that's entirely different.  So that might be added to

6    his IEP through the use of a functional behavioral assessment.

7         The students at St. Calettuce have a very extensive

8    functional behavioral assessment.  And those children do not

9    have talk therapy.  Most of those children have very physical

10   re-enforcement.  And those children have re-enforcement that

11   are very necessary, it's like if you do something then you get

12   something immediately.

13        So, it's not just we're going to review a file, we're

14   gonna interview a teacher, then we're gonna say we're gonna

15   put this thing in place.  We have to take a look at what kind

16   of behavior happened, then we're gonna see what you do when

17   the behavior happens, and then we're gonna look at what

18   happened - - we're gonna see what the consequence of the

19   behavior is, and how you respond to the consequence.

20        It's a very involved piece and when you have an FBA

21   that's done correctly, it really impacts the IEP, and it

22   really impacts the social emotional goals and objectives.

23        MR. TURKER:  Now, you just gave us some examples of - -

24   the way I phrased my question was, things that could change in

54

111

1    a child's educational program.  Those examples you gave, are

2    those from your experience or were those truly hypothetic?

3         MS. MILLIS:  No, those are from my experience.

4         MR. TURKER:  I have no further questions, that's my

5    understanding what the hearing officer was still wondering

6    about.

7         HEARING OFFICER:  Okay.  Ms. Lindsay, you have any cross?

8         MS. LINDSAY:  I wanted to ask questions specifically

9    about D██████.

10        HEARING OFFICER:  Go ahead.

11        MS. LINDSAY:  Ms. Millis, you indicated that D█████ has

12   been in your caseload for two years?

13        MS. MILLIS:  Correct.

14        MS. LINDSAY:  And I know we understand that you have been

15   out of commission, you were out of commission for a period of

16   time?

17        MS. MILLIS:  Right.

18        MS. LINDSAY:  When was that, do you remember that period

19   of time that you - -

20        MS. MILLIS:  Oh yes.

21        [Laughter.]

22        MR. TURKER:  Well hold, I'm sorry, can we, I mean I know

23   what Ms. Harris Lindsay is talking about.  Can we just for the

24   record, define what out of commission means in this case?

                              55                              112

1        MS. LINDSAY: Which, I'm just, I don't know - -

2        MR. TURKER:  She was in a coma.

3        [Laughter.]

4        MS. LINDSAY:  No, well, I know that you were, you're

5    absent - -

6        HEARING OFFICER:  She was disabled for a while so that's

7    it, everybody knows that, so go ahead.

8        MS. LINDSAY:  Disabled, oh well, right, okay, I wasn't

9    saying that you can't - -

10       MR. TURKER:  No, I know, I just, like just her record was

11   questionable.

12       MS. LINDSAY:  What was the period of time?

13       MS. MILLIS:  From December the 4th to approximately

14   January the 20th.

15       MS. LINDSAY:  Okay.  And during that time were you - -

16   you weren't working on cases, is that correct?

17       MS. MILLIS:  Oh yes I was.

18       MS. LINDSAY:  Oh you were?

19       MS. MILLIS:  Oh yes I was.  The only time - -

20       MS. LINDSAY:  Okay, ho, ho, ho, ho, ho - -

21       MS. MILLIS: - - that I was not working on cases - -

22       MS. LINDSAY:  Okay, go ahead.

23       MS. MILLIS:  Was from December the 4th to December the - -

24   wait a minute, let me get this, December the 13th.

1        MS. LINDSAY:  Okay.

2        MS. MILLIS:  I was actually holding meetings in the

3  hospital.  By phone.

4        MS. LINDSAY:  Okay.

5        MR. TURKER:  I'll stick to those being a slave driver.

6        MS. LINDSAY:  Okay, that's fine.

7        My question is in the time, during the time you were not

8  hospitalized, did you follow up on D‗‗‗, meeting to review

9  the Comp, the um, the FBA?

10        MS. MILLIS:  I'm sorry, I'm not understanding - -

11        MS. LINDSAY:  During the time you said you were even

12  holding meetings in the hospital.

13        MS. MILLIS:  Right.

14        MS. LINDSAY:  Right.  Did you request or make efforts to

15  bring the team together at Rock Creek to review D‗‗‗‗ FBA?

16        MR. TURKER:  I object for two reasons, one it's outside

17  the scope, the other is we haven't got to in this case yet.

18  But once again, we have - -

19        HEARING OFFICER:  Umm - -

20        MR. TURKER:  I - - can I just say - -

21        HEARING OFFICER:  Go ahead.

22        MR. TURKER:  We had DCPS as, is, case in almost every

23  single hearing we do, raising a bunch of defenses and making a

24  bunch of arguments that are nowhere in their responses.

1          HEARING OFFICER:  Alright, well, what I wanna hear though

2     is the questions.  Okay, I understand of the, whatever it is,

3     that you guys have one up.  I don't care about that, I'm

4     trying to find out what's going on in this case.

5          So I've allowed her to question.  Now even though she may

6     not go into the things you went to, I'm gonna allow some

7     discretion because I want to hear what's going on.  And then

8     I'm gonna ask some questions.  So I'll put a continuum of

9     objection in the record for your benefit, indicating that

10    she's going to be going outside the scope, because I want to

11    hear this.

12         Alright, go ahead.

13         MS. LIDSAY:  Okay Ms. Millis, did you remember the

14    question I asked?

15         MS. MILLIS:  No, I'm sorry, say it again for me, please.

16         MS. LINDSAY:  Sure.  What efforts did you take to or, Did

17    you make any efforts to bring the team together to review

18    D██████ FBA that is dated 10-2006?

19         MS. MILLIS:  I believe that there was a meeting, - -

20         MS. LINDSAY:  Now, are you look - - okay.

21         MS. MILLIS:  - - and I'm not sure - -

22         MS. LINDSAY:  You're not looking at documents, are you?

23         MS. MILLIS:  No.

24         MS. LINDSAY:  Okay, go ahead.

1      MS. MILLIS:  No, I'm sitting in my car, not looking at

2   any documents.

3      MS. LINDSAY:  Okay.

4      MS. MILLIS:  But I believe that there was a meeting, and

5   I actually wrote in the - -

6      MR. TURKER:  She's not driving is she.

7      MS. MILLIS: - - meeting notes that the FBA was not

8   adequate.

9      MS. LINDSAY:  Okay, we are not talking about the

10  adequacies of the FBA, I'm just asking you - -

11     MS. MILLIS:  Thought there was a meeting.

12     MS. LINDSAY: - - whether you - - When was the meeting

13  held?

14     MS. MILLIS:  At the one that brings the team together.

15     MS. LINDSAY:  What meet - -

16     MS. MILLIS:  I don't schedule these meetings.

17     MS. LINDSAY:  Okay, what meeting was held, Ms. Millis?

18     MS. MILLIS:  There was an MDT meeting.

19     MS. LINDSAY:  When was it held?

20     MS. MILLIS:  That, I can't tell you because I'm not

21  looking at the documents, but I believe it was held in

22  November.

23     MS. LINDSAY:  And so there was a meeting in November, to

24  review D███████ FBA?

116

1        MS. MILLIS:  I think there was a meeting.  I believe

2    there was a meeting.  I'm not sure if there was a meeting.

3        MS. LINDSAY:  Okay.  Thank you.

4        You indicated that the FBA go - - Well, let me ask you,

5    Rock Creek - -

6        MS. MILLIS:  No wait a minute, wait a minute, no, that's

7    the wrong child.  I'm sorry, that's the wrong child.

8        MS. LINDSAY:  Okay.

9        MS. MILLIS:  I'm sorry.

10        MS. LINDSAY:  So there was no - -

11        MS. MILLIS:  I've got the wrong child here.  I'm

12    absolutely wrong.  There was no, no, no.  There was no meeting

13    for D██████ then, no.  I'm thinking of his brother.  No, there

14    was no meeting for D██████ to review the FBA.  But it's not my

15    responsibility to call the meeting.

16        MS. LINDSAY:  Okay.

17        MS. MILLIS:  We did see - -

18        MS. LINDSAY:  Hold on, hold on Ms. Millis, hold on, Ms.

19    Millis.  Ms. Millis?  Thank you.  Ms. Millis, Ms. Millis, hold

20    on, hold on.  I just need you to answer the questions, and we

21    can move along.

22        MS. MILLIS:  Okay, I'm sorry, the meeting that we called

23    to review the FBA was yesterday.

24        MS. LINDSAY:  Okay, hold on, Ms. Millis, I'm not - -

1          MS. MILLIS:  And, and - -

2          MS. LINDSAY:  The meeting - -

3          MR. TURKER:  Wait a minute, the question was whether or

4    not Ms. Millis had a contact with them about setting up a

5    meeting, and now her answer is being cut off.

6          MS. LINDSAY:  But she changed her answer.  So - -

7          MS. MILLIS:  Right I did because I'm not looking at

8    documents - -

9          MR. TURKER:  Tell us a little more about the incidence.

10         HEARING OFFICER:  Wait just a minute.

11         MS. MILLIS:  Sorry.

12         HEARING OFFICER:  Ms. Millis, wait just a minute.  Now

13   I'm not gonna - - I'm gonna start raising my voice.

14         MS. MILLIS:  Okay.

15         HEARING OFFICER:  You know, she allows you two questions

16   for witness.  Allow her the same benefits.

17         MS. LINDSAY:  I'm sorry, I apologize.

18         HEARING OFFICER:  I have indicated - -

19         MR. TURKER:  He's talking to you Ms. Millis.

20         HEARING OFFICER:  I have indicated, I will file, continue

21   objection to the questions, but I would like to hear it.  So

22   please, Mr. - -

23         MR. TURKER:  I'm objecting to her cutting her off.  I'm

24   not objecting to her asking her questions

1      MS. LINDSAY:  She's not answering - - she's not being

2  responsive.

3      MR. TURKER:  She's not being allowed to answer.

4      HEARING OFFICER:  Wait a minute, she was going on, and

5  she'd ask the question and she wanted to post another

6  question.

7      HEARING OFFICER:  So Ms. Millis?

8      MS. MILLIS:  Yes sir.

9      HEARING OFFICER:  Just answer her questions, then if you

10  need further time to explain, just ask me.

11      MS. MILLIS:  Okay, I'm sorry.

12      HEARING OFFICER:  But just, let's just be really focused.

13      MS. MILLIS:  Okay.

14      HEARING OFFICER:  Alright, counsels.  I don't want to say

15  nothing to anybody, so let's go forward.

16      MS. LINDSAY:  Okay, Ms. Millis?

17      MS. MILLIS:  Yes.

18      MS. LINDSAY:  From October, When is the first time you

19  saw D████████ FBA?

20      MS. MILLIS:  I first time that I saw D████████ FBA was

21  actually, yesterday.

22      [Pause.]

23      MS. MILLIS:  I apologize I was thinking of his brother.

24      MS. LINDSAY:  Okay, that's fine.

119

1      So, from October 2006 to February 2007, is it correct

2  that you never observed D████ at Rock Creek in his classroom?

3      MS. MILLIS:  No, that's not what I said.

4      MS. LINDSAY:  No, no.  I didn't say to said that, I'm

5  asking you a question.

6      MS. MILLIS:  No, Yes, I've seen D█████ in his classroom.

7  I've seen him in the halls, I've seen him in the classroom.

8  I'm up there almost every week, and so, I have contact in one

9  form or fashion with almost all of my clients.

10     MS. LINDSAY:  Okay then my question is, you on direct,

11 you said you have not observed D█████ directly in his

12 classroom.  Are you changing that testimony?

13     MS. MILLIS:  I think you asked me recently.

14     MS. LINDSAY:  No, no, I did not.

15     MS. MILLIS:  I think you said recently.

16     MS. LINDSAY:  No.

17     MS. MILLIS:  In the last year, yeah I've seen D█████.

18     MS. LINDSAY:  No, no, listen Ms. Millis, I said from

19 October, since October 06, this period of time specifically,

20 October '06 thru February 15, '07.  Did you observe D████ in

21 his classroom?

22     MS. MILLIS:  Oh, I've seen D█████ in his classroom, yes.

23     MS. LINDSAY:  Okay.  When did you observe D█████ in his

24 classroom in that - -

120

1       MS. MILLIS:  Oh I can't tell you the date.  I can't tell

2   you date.  I mean, when I go up there, I'm checking on the

3   student, I see the student in the hall, I stick my head in the

4   classroom for a couple of minutes.  But I don't sit down and

5   do a formal observation.

6       Now, I'm assuming that that's what you mean, a formal

7   observation, where you sit down for a half-an-hour, 45

8   minutes, I don't do that.

9       MS. LINDSAY:  Okay, when you said on direct, this is when

10  Mr. Turker asked questions that one of your duties is to

11  perform observations of children in the classroom.  You were

12  referring to formal observations?

13      MS. MILLIS:  Well I don't observe the children that are

14  up at Rock Creek, unless someone says, ``we have a problem,

15  you have to come in and observe.''

16      MS. LINDSAY:  Okay - -

17      MS. MILLIS:  I do, do formal observation, but - -

18      MS. LINDSAY:  Okay so my - -

19      MS. MILLIS:  But - -

20      MS. LINDSAY:  Hold up, my question - -

21      MR. TURKER:  Remember she's answering the question again

22  and being cut-off. I mean she didn't repeat, she didn't answer

23  the question - -

64                                                      121

1      HEARING OFFICER:  Mr. Turker, Mr. Turker.  Wait just a

2  minute Mr. Turker.

3      [Pause.]

4      HEARING OFFICER:  Listen to me.  Are you listening?

5      MR. TURKER:  I am.

6      [Pause.]

7      HEARING OFFICER:  I'm trying to get a clear

8  understanding.  If there is some conflict in her testimony,

9  you can't cure it by interrupting.

10     MS. MILLIS:  And I'm, I'm being, I'm being, I'm being

11  very conflictual here.  And it's just my fault, and I'm sorry.

12     HEARING OFFICER:  Wait just - -

13     MR. TURKER:  Ms. Millis, he's talking to me again.

14     HEARING OFFICER:  No I wasn't.

15     MS. MILLIS:  Oh I'm sorry, no, it's me though, I'm being

16  really conflictual with him.

17     MR. TURKER:  Ms. Millis, please, the hearing officer is

18  talking to me.

19     HEARING OFFICER:  Sir, you can't - - If she is saying

20  something conflicting just let it happen, it's not gonna - -

21  just let it occur.  Don't interrupt, I mean, she has

22  conflicted herself, a couple of times.  The bottom line is,

23  what does it mean?  I have to determine what it means, I don't

24  know what it means.  And you interrupting, been saying that

65

122

1   she's been cut off.  She's only acting like any attorney, if

2   you find some conflict you're gonna cut off and go to the next

3   point.  You have to cure her on redirect.

4        MS. TURKER:  May I put the witness on hold so that I

5   don't correct her.

6        HERAING OFFICER:  No, she's okay, she's okay, she should

7   be here.

8        MR. TURKER:  That's fine, I just don't wanna, I don't

9   want to refute her testimony, I don't want to refute her

10  testimony that's all.

11       HEARING OFFICER:  Now she ain't, she's not gonna be with

12  it.

13       MR. TURKER:  Okay, well, well, well, my concern here is

14  that, is that when somebody is going to be impeached, I mean,

15  this is a clear rule anywhere.  When a witness is being

16  impeached, they're allowed to explain themselves.

17       And so now, we've got counsel from DCPS, nit-picking at

18  some real things.  Like what do we mean by observing this

19  context was, what do we mean by observing this context.  The

20  witness is prepared to explain it.  She's trying to answer the

21  question, she's trying say, what, this is when I do a formal

22  observation, this is when I don't, this is what I meant when I

23  tried to say this, - -

24       HEARING OFFICER:  Alright.

1        MR. TURKER: - - and then she's getting cut off, - -

2        HEARING OFFICER:  That's it.

3        MR. TURKER:  That's not what cross examination is for.

4        HEARING OFFICER:  That - - We all have different views,

5    that's your view.  Now - -

6        MR. TURKER:  I know, and I'm putting that on the record.

7        HEARING OFFICER:  Alright, so now let's go forward.

8        MR. TURKER:  But I'm not interrupting the witness.  I'm

9    interrupting counsel from interrupting the witness.  I want

10   that to be clear.

11       HEARING OFFICER:  Well, well, no, you were, you're, - -

12       MS. LINDSAY:  If I might.

13       HEARING OFFICER:  The flow of the questions is

14   interrupted when you object like that, and that's what I

15   understand, so do you have any other questions?

16       MS. LINDSAY:  I do, I'm just trying to ask her, if Ms. -

17   -

18       MR. TURKER:  I'm going to try to do my job when defending

19   my witness when she' being miss intended to - -

20       HEARING OFFICER:  Now wait a minute.

21       MR. TURKER:  That's part of my job.

22       HEARING OFFICER:  First of all, okay, now, we're gonna

23   get to another level, Mr. Turker.  Because my job is to

1   understand what went on and you were interrupting my job.  So

2   don't interrupt my job.

3       Your job is to cure whatever potential problem on

4   redirect.  That's what you can do.  But you're interrupting my

5   job, because I don't understand what's going on and I wanna

6   know.  So I can write-up a reasonable decision, which is what

7   you want, don't you?

8       MR. TURKER:  Absolutely.

9       HEARING OFFICER:  Alright then, so, if there's a problem,

10  write it down, and then say, ``you said, on cross, this

11  occurred.  Is that what you mean?''  I mean, you could cure

12  her of all these things, it's not a big problem.

13      Alright go forward.

14      MS. LINDSAY:  Okay.

15      HEARING OFFICER:  Ms. Lindsay.

16      MS. LINDSAY:  Ms. Millis, I'm just trying to get some

17  clarification.  On direct, you said, you had not performed any

18  observations on D████ directly.  And then when I asked you

19  Had you performed observation - - when - - Is that correct

20  when I simply re-asked the question, you said, No, you had

21  observed D████, but you can't tell the date.  Now, I wanna

22  ask - -

23      MS. MILLIS:  Well, let me - -

68

125

1        MS. LINDSAY:  Wait, wait, wait, all - - now my question

2    to you, is, Are you making a distinction in your definition of

3    observation?

4        MS. MILLIS:  Yes, I am.  I am.

5        MS. LINDSAY:  Okay.  Now, can you please - - just, just,

6    just answer my question.  When you say you didn't observe

7    D█████ directly.  What did you mean?

8        MS. MILLIS:  Okay.  For me, a direct observation is one

9    that I usually do, and I don't it in my private school

10   setting.  I rarely do it in my private school setting because

11   I usually don't need to do it in my private school setting,

12   where I call up; I make an appointment; I come in; I sit down;

13   I spent one or two hours in the classroom; speaking with the

14   teachers; speaking with related service providers; speaking

15   with the S.E.C.  That, to me is a direct observation, okay.

16   Normally, that's what I call a direct observation.

17       When I go to the private schools, especially schools

18   where there are a lot of clients, I'll touch base with

19   different people; I'll keep people in the halls; I'll stick my

20   head in the classrooms, so that I'll find out what's going on.

21       So, when you say observe, I've seen it.  I've looked at

22   it.

23       MS. LINDSAY:  Okay.

24       MS. MILLIS:  So, I mean - -

                              69

                                                          126

1       MS. LINDSAY:  Okay, thank you.

2       MR. TURKER:  Unbelievable.

3       [Laughter.]

4       MS. LINDSAY:  Cross examination here.  I get my answers.

5       MR. TURKER:  How can we even stop in the middle in her

6  answer to the question?

7       HEARING OFFICER:  She gets cut off.

8       MS. LINDSAY:  She's repeating herself.

9       MR. TURKER:  The exact question was, can you have

10  explained these things.

11       HEARING OFFICER:  Alright I've heard enough.

12       MS. LINDSAY:  Ms. Millis.

13       MS. MILLIS:  Yes.

14       MS. LINDSAY:  You've indicated that behavior has been the

15  issue for D██████ since he's been at Rock Creek, is that

16  correct?

17       MS. MILLIS:  Behavior is a concern, yes that's true, and

18  prior to when he was at Rock Creek, yes.

19       MS. LINDSAY:  Now, we're talking about Rock Creek, just

20  Rock Creek.

21       MS. MILLIS:  Yes, uh-hah.

22       MS. LINDSAY:  You said behavior was an ongoing problem.

23       MS. MILLIS:  Right.

1       MS. LINDSAY:  Okay, what, what's the basis of that

2  information?

3       MS. MILLIS:  His progress report, his teacher report, the

4  IEP meeting, parents conferences.

5       MS. LINDSAY:  Okay, so other than the anecdotal

6  documentation you're referring to, you have no first-hand

7  knowledge of the behaviors that you're being, that you refer,

8  that you've lumped in that says behavioral problem over the,

9  through his history at Rock Creek?

10       MS. MILLIS:  I'm not sure I understand that question.

11       MS. LINDSAY:  Sure, I'll, you, the list of documents that

12  you said you referred to.

13       MS. MILLIS:  Right.

14       MS. LINDSAY:  As the basis for your statement on direct -

15  -

16       MS. MILLIS:  Ah-hah.

17       MS. LINDSAY:  That behavior has been an ongoing problem

18  for D██████.

19       MS. MILLIS:  Right.

20       MS. LINDSAY:  You have not observed these behaviors, is

21  that correct?

22       MS. MILLIS:  No, I haven't observed them.

23       MS. LINDSAY:  Okay.

24       [Pause.]

1      MS. LINDSAY:  Now, Rock Creek is known for their

2  behavioral intervention plan, or their behavioral component,

3  is that correct?  Or do you know them to have a behavioral

4  component to their program?

5      MS. MILLIS:  Yes, they do.

6      MS. LINDSAY:  And, is it your understanding that all

7  their students have access or have the benefit of their

8  behavioral component?

9      MS. MILLIS:  Yes, they do.

10      MS. LINDSAY:  And is it also your understanding that Rock

11  Creek uses whatever anecdotal evidence that they have in

12  servicing the students to determine how to adjust the

13  student's use, or the school's implementation of that

14  behavioral component?

15      MS. MILLIS:  That is not necessarily my understanding.

16  I'm not sure how you mean that question.

17      MS. LINDSAY:  Well for if, if a teacher, well, okay - -

18      [Pause.]

19      MS. LINDSAY:  Now you told me that you don't generally

20  perform direct observations when the student is in a private

21  school setting.  Do you remember that?

22      MS. MILLIS:  Correct.

23      MS. LINDSAY:  Okay.  Why?  Why not?

129

1    MS. MILLIS:  Well, normally there's no need for me to

2    perform a direct observation and there are a lot of clients

3    that I have, and it's an extraordinarily time consuming.  I

4    mean, there are some that I do, but the majority of them I

5    don't.

6    MS. LINDSAY:  And you did not, is it correct that you

7    didn't perform one on D███████ because you didn't believe it was

8    needed?

9    MS. MILLIS:  No.  No one has asked me to do one on

10   D██████.

11   MS. LINDSAY:  So, as a educational advocate for D██████,

12   someone has to make that recommendation or you don't make that

13   recommendation on your own as his educational advocate?

14   MS. MILLIS:  Once the student is in a setting that I

15   think is appropriate, and providing educational benefit, and

16   I'm in contact with his setting on a regular basis, and, I

17   don't hear someone say to me, you need to go down and observe,

18   or you need to do this, or you need to do that.  No, I do not.

19   MS. LINDSAY: Okay.  Thank you Ms. Millis.

20   HEARING OFFICER:  Redirect.

21   MR. TURKER:  Hi Ms. Millis.

22   MS. MILLIS  Hi.

23   MR. TURKER:  If you just give me a second I'm just

24   finishing a note.

1    [Pause.]

2    MR. TURKER:  Okay.  Can you please explain more fully

3    your distinction between direct and other observation as

4    you've been testifying about it?

5    MS. MILLIS:  Right.  I mean a direct observation is one

6    that is, um, for me that sets up full complete observations.

7    That's the one that I call the school and I schedule.  That's

8    the one that takes usually one to two hours, I review the

9    student's file; I will usually take a look at the student in

10    those a regular educational setting, and a special education

11    setting.  It is usually in a public school rather than non-

12    public school.  I speak with related service providers, I

13    speak with teachers, I speak with special education

14    coordinator, and it is one that has been requested.

15    If it has been requested in a non-public school, then I

16    do the same thing.  It's one that's scheduled.  As I've said,

17    it's a rare situation where I will go into a private school

18    and do a full observation.

19    MR. TURKER:  Okay.  And you talked a little bit about

20    Rock Creek's behavioral modification program?

21    MS. MILLIS:  uh-mm.

22    MR. TURKER:  Do they ever make modifications to that

23    program based on the particular evals of the child?

74

131

1      MS. MILLIS:  Yes, they do.  They do it on a regular

2  basis.  And they do have a behavioral modification program,

3  but that's part of what should be included in the functional

4  behavioral assessment as well.

5      And, when the DCPS attorney was asking if that was a part

6  of the FBA that was my concern.  I didn't see any evidence of

7  point sheets or anything else that was included in that

8  document.  I didn't see any analyzes, I didn't see any

9  discussion of anything, so I - -

10      MR. TURKER:  Okay, you've gone a little past my question.

11      MS. MILLIS:  Oh I'm sorry.

12      MR. TURKER:  And you testified earlier on direct, about

13  the uses of - -

14      HEARING OFFICER:  On cross.

15      MR. TURKER:  No, on direct.

16      HEARING OFFICER:  On direct?

17      MR. TURKER:  About the uses of an FBA in programming for

18  a child.

19      MS. MILLIS:  Right.

20      MR. TURKER:  Have you participated in that kind of

21  application of an FBA at Rock Creek?

22      MS. MILLIS:  Yes.

23      MR. TURKER:  Is that something that you understand them

24  to be capable of doing with an FBA?

132

1       MS. MILLIS:  Oh absolutely.  Absolutely.  And this wasn't

2   my decision about the FBA.  I mean, the team looked at this

3   particular document, and said - -

4       MR. TURKER:  Okay, I think you've gotten outside my scope

5   a little bit.

6       MS. MILLIS:  Oh, okay.

7       MR. TURKER:  I have no further questions.

8       HEARING OFFICER:  Do have any re-cross?

9       MS. LINDSAY:  No.

10      HEARING OFFICER:  Alright Ms. Millis, this is Mr. Jones.

11      MS. MILLIS:  Yes sir.

12      MR. TURKER:  I'm gonna ask you a couple of questions.

13      MS. MILLIS:  Okay.

14      HEARING OFFICER:  So you indicated that you have a formal

15   indication process.

16      MS. MILLIS:  Right.

17      HEARING OFFICER:  Which Primarily it's for the public

18   schools, correct?

19      MS. MILLIS:  Right.

20      HEARING OFFICER:  And that your informal observation is

21   primarily for the private school settings because you believe

22   that they are appropriate educational settings, correct?

23      MS. MILLIS:  Well, let me say to you that when I have a

24   child that's placed, and I have some level of comfort with

1    that placement, then I don't feel as though I need to spend

2    hours doing an observation, gathering information, speaking to

3    service providers, and speaking to teachers, because I've

4    already done that.  And that's why I've placed that child in

5    that setting.  So it's more touching base, finding out what's

6    going on.  I mean, even looking at kids walking thru the hall,

7    while I'm sitting there waiting for meetings, kids are walking

8    thru the halls, and so, I'm just, I'm checking and seeing

9    what's happening, while, you know, they're walking thru halls,

10   talking to them, and service providers are coming to me and

11   saying things, or teachers will talk to me.

12       So, that's sort of how I get information.  And that to me

13   is keeping me, you know, abreast of what's going on, when I'm

14   in my other setting.

15       HEARING OFFICER:  Had you had any problems with D██████

16   B████ walking in the hallways?

17       MS. MILLIS:  No, I've seen him in the halls.  I've seen

18   him, yes.  I've seen him in the halls, and teachers have, you

19   know, have come up to me and I've noticed a couple of things,

20   yeah.

21       HEARING OFFICER:  Uh-mm.  Alright, thank you.

22       HEARING OFFICER:  The witness is dismissed, thank you

23   very much, Ms. Mills.

24       MR. TURKEER:  Thank you.  Bye-bye.

1       MS. MILLIS:  Bye-bye.  Thank you.

2       HEARING OFFICER:  Any other witnesses?

3       MR. TURKER:  No.

4       HEARING OFFICER:  Alright, summaries.  After I've been

5    screaming to the two of you.

6       MR. TURKER:  Uh - -

7       MS. LINDSAY:  Oh you screamed at me, I didn't notice it.

8       MR. TURKER:  Yeah I think he's been screaming at the DCPS

9    counsel on this.

10

11                  **CLOSING REMARK OF MR. TURKER**

12

13       MR. TURKER:  I think most of it has already been said

14    already.  However, I want to post a couple of things before I

15    get to Ms. Millis' testimony.  One is that, as I said, there's

16    nothing new about this.  DCPS has, as long as I've been doing

17    this, been trying to create a world in which, they don't do

18    evals, and then they come to the hearing and they say, ``ha

19    ha, you can't prove to us that there is any harm from us not

20    doing evals, because we didn't the evals.''

21       And that's not what this law is intended to do, and I'm

22    here as a chance if any federal judge would uphold that kind

23    of reasoning.  I've never had, I mean, my appeals, I've never

24    had DCPS try to make that argument.  Try to say, yeah we

1  didn't do the eval, but it doesn't matter because you can't

2  prove there was enough of fate based on the eval.

3      I mean there is, there's a lot of appeals out there

4  ordering DCPS to do evals.

5      Without worrying that issue, the whole point is, - -

6      Umm?

7      HEARING OFFICER:  I missed that last one you have - -

8      MR. TURKER:  I've had plenty of decisions out there

9  ordering - - federal court decisions, ordering DCPS to do

10  evaluations without worrying about the question of whether the

11  denial of fate was established, for the failure of the

12  evaluation because of that very simple reason that, How can

13  you ever argue about it.

14      I mean DCPS has created this situation, in which we can't

15  ultimately know the harm, by failing to do what they were

16  supposed to do in the first place.

17      So what we can do, and I think, the hearing officer

18  appropriate led us in this direction.  We can talk about, what

19  are FBA's used for generally, and what kind of impact can they

20  have.  And I think Ms. Millis gave very full testimony

21  regarding that; the kinds of changes you can do with an FBA.

22      So, I think based on that testimony, unless DCPS can come

23  forward which they haven't done, and show us that that

24  wouldn't have happened in this case.

1       And you know there are situations, where it happen, for

2   example, you know, you can have an evaluation, let's say you

3   have an O.T. evaluation.  I mean an evaluation says flat out,

4   no services.  Well, I'm not gonna come in and complain about,

5   it having not been reviewed in time, or made part of the IEP,

6   because that's a dead loser.  I mean because obviously, there,

7   you've got clear evidence, Yeah it wasn't gonna have any clear

8   impact on the kid.  It said no services.

9       But that isn't this case, we do have a child with

10  behavioral issues, we have a child where the documents show

11  that whole reason they ordered the evaluation was to make sure

12  that they were getting his disability classification correct.

13      We have the evaluation itself, which indicates that

14  possibly he needs a new classification.  In fact, the

15  evaluation clearly states he should also be ED.

16      And we have as a result of the evaluation, new

17  evaluations being ordered.  All of which may well lead to a

18  change in his programming.  And I think on that basis, that is

19  more than enough to show the harm on him.

20      HEARING OFFICER:  Alright, uh - -

21      MS. LINSAY:  Sure.

22

23          **CLOSING REMARK OF MS. LINDSAY**

24

1      MS. LINDSAY:  This case is not about doing an evaluation.

2   It's about reviewing the evaluation.  We have no clinical

3   testimony to dissect D██████ FBA, that's what we're here

4   talking about.

5      And Ms. Millis never provided any testimony, whatever,

6   about how the failure to review this evaluation resulted in

7   any educational injury to D████.  More telling, she indicated

8   that, once a student is in a program, these private programs,

9   and she believes they're providing educational benefit for the

10  student, then she generally doesn't do a formal observation,

11  unless requested.  She said, in this case, there was no one.

12  There was no request to do and to perform her observation, and

13  she didn't feel the need to do so.

14      So, based on her testimony, and in the fact of the case

15  as it is plead, there um, - - counsel hasn't, parent hasn't

16  met their burden to show that the failure to review the

17  meeting, between the October date, 2006 date and the February

18  15th, 2007 filing of the complaint, student who says, suffered

19  any educational injury.

20      HEARING OFFICER:  Alright

21      [Pause.]

22      HEARING OFFICER:  Review a assignment.  And you can

23  respond if you so desire.  You indicated that you've had some

138

1    federal cases involving issue of, review of a violations of a

2    denial of fate.  I like the - -

3        MR. TURKER:  Performance.  I can't guarantee you that

4    I've haven't looked at the review.

5        HEARING OFFICER:  Well that's - -

6        MR. TURKER:  I probably have, but I know I've had some

7    important points.

8        HEARING OFFICER:  That's the issue here.  You've alleged

9    that the failure review to this FBA is a denial of fate.  Well

10   then, a private placement setting, which has been providing

11   educational benefits and implementing the IEP - - See this is

12   a whole different fact pattern.  I mean, I like to use it in

13   research on that one, I mean if that's not a very, very narrow

14   issue.  And if you can come up with me some case, I would

15   suggest that, within that fact pattern, there has been a

16   declaration of D██████ fate why I'll look at it.

17       But, I'll give you a week to look at it.  And if you want

18   to, Ms. Lindsay, you can respond or you can provide what you

19   consider to be a response of memorandum.  No more than two

20   pages.  I don't want to go into no - - that's a very narrow

21   subject.

22       [Laughter.]

1       MR. TURKER:  So okay, so I know, I mean I'm, we'll see,

2   federal about the failure to review an evaluation when the

3   child is at a private school.  That's the - -

4       HEARING OFFICER:  That's really where we are at, I think.

5   I mean if you think there's another issue that's involved in,

6   you can put it out there and I'll look at it.

7       MR. TURKER:  Well I would, I mean, I'll make this a good,

8   at it becomes necessary, I don't know if I could find either

9   one, but I think there is a practical difference in failing to

10  review an evaluation and in failing to do it.

11      HEARING OFFICER:  Well - -

12      MR. TURKER:  Unless, the evaluation itself, like I said,

13  it's clear that there's no issue.

14      HEARING OFFICER:  That kind of, you know, that's a

15  nuance.  It is a real narrow nuance, but you know, I'm open to

16  see what you have, so that I can make sure that we're on the

17  side of the same playing field.

18      Alright thank you very much the hearing is adjourned.

19      MS. LINDSAY:  Okay, thank you.

20      HEARING OFFICER:  Uh-mm.

21      [Hearing was adjourned 10:42 a.m.]